In Re: TAX ASSESSMENTS *Against* CHARLESTON FEDERAL SAVINGS & LOAN ASSOCIATION, FIRST FEDERAL SAVINGS & LOAN ASSOCIATION, WEST VIRGINIA BUILDING AND LOAN ASSOCIATION *and* EMPIRE SAVINGS & LOAN ASSOCIATION

(No. 9501)

Submitted January 19, 1944. Decided February 22, 1944.

Koontz & Koontz, W. Elliott Nefflen and Harry B. Lambert, for appellants.

Ira J. Partlow, Acting Attorney General, and Kenneth E. Hines, Assistant Attorney General, for appellees.

508

Fox, Judge:

The appellants, Charleston Federal Savings & Loan Association, First Federal Savings & Loan Association, West Virginia Building & Loan Association, and Empire Federal Savings & Loan Association, complain of a final order of the Circuit Court of Kanawha County, entered on the 23rd day of December, 1941, fixing the 1941 assessment for tax purposes of the intangible property owned by them, respectively. Their appeal is prosecuted under the provisions of Code, 11-3-25, as amended by Chapter 41, Acts of the Legislature, Regular Session, 1933.

The Assessor of Kanawha County, following instructions of the State Tax Commissioner, made the following assessments of the intangible property of the appellants, taxable in said county, for the year 1941: Charleston Federal Savings & Loan Association, $921,180; First Federal Savings & Loan Association, $249,080; West Virginia Building & Loan Association, $69,490; and Empire Federal Savings & Loan Association, $273,880. On protest filed before the county court of said county, acting as a Board of Review and Equalization, under the provisions of Article 3, Chapter 41, Acts Regular Session, 1933, a hearing was had before said board, which resulted in an order reducing said assessments approximately thirty per cent, and they were fixed as follows: Charleston Federal Savings & Loan Association, $639,030; First Federal Savings & Loan Association, $170,450; West Virginia Building & Loan Association, $48,230; and Empire Federal Savings & Loan Association, $189,600. These reductions appear to have been made solely on the theory that other property of the same class, in the same taxing district, was assessed at approximately seventy per cent of its true and actual value, and that the assessments made by the assessor discriminated against protestants. No contention has ever been made that the assessments of the property of the appellants, made by the assessor, were in excess of the true and actual value thereof.

The State Tax Commissioner prosecuted an appeal from the action of the Board of Review and Equalization

to the Circuit Court of Kanawha County, and, on December 23, 1941, that court entered an order reversing the action of said board and fixing the assessments in question at the same amounts as those originally made by the assessor, from which action of the circuit court we granted this appeal.

The property of the appellants, the assessment of which is here involved is Class I property, as defined by Article 8 of Chapter 38, Acts Regular Session, 1933, and carries an initial tax rate of fifty cents on each one hundred dollars valuation. This statutory classification was made under Section 1, Article X of our Constitution, the pertinent provisions of which are:

> "Subject to the exceptions in this section contained, taxation shall be equal and uniform throughout the state, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value; except that the aggregate of taxes assessed in any one year upon personal property employed exclusively in agriculture, including horticulture and grazing, products of agriculture as above defined, including live stock, while owned by the producer, and money, notes, bonds, bills and accounts receivable, stocks and other similar intangible personal property shall not exceed fifty cents on each one hundred dollars of value thereon * * *."

In connection with the constitutional provision quoted above, it is well to keep in mind the general provisions of our statute, Code, 11-3-1, relating to the assessment of property of all classes. These are:

> "All property shall be assessed annually as of the first day of January at its true and actual value; that is to say, at the price for which such property would sell if voluntarily offered for sale by the owner thereof, upon such terms as such property, the value of which is sought to be

ascertained, is usually sold, and not the price which might be realized if such property were sold at a forced sale, * * *."

Questions affecting the assessment of the property of building and loan associations have received the attention of the courts and the legislature in recent years. Prior to the adoption of the tax limitation amendment, (Section 1 of Article X of the Constitution) and enabling statutes enacted thereunder, the property of building and loan associations was not assessed for tax purposes to the association itself, but investments therein were assessed to individual firm or corporate stockholders, following the decision of this Court in *Ohio Valley Building and Loan Assn.* v. *County Court*, 42 W. Va. 818, 26 S. E. 203. However, in the later case of *Charleston Federal Building & Loan Association* v. *James*, 120 W. Va. 781, 200 S. E. 845, decided on December 8, 1938, it was held that, "Both state and federal building and loan associations are incorporated companies within the meaning of Code, 11-3-12, and are corporations within the meaning of Code, 11-3-13. Therefore, their intangible and other personal property is subject to taxation."

The legislature convened in regular session in January, 1939, and was charged with knowledge of the case last cited above when it enacted Chapter 118 of the Acts of that session, now carried in Michie's Code, 1943, as Section 14a, Article 3, Chapter 11. That section is a comprehensive one, and covers in detail all phases of the assessment of the property of building and loan and federal savings and loan associations. We note the first paragraph of the section, which reads as follows:

"The capital of every building and loan association and federal savings and loan association, as represented or evidenced by the investment shares and investment accounts in such association, shall be assessed at its true and actual value, according to the rules prescribed by this chapter, to such building and loan association or federal savings and loan association in the county,

district and town where such association is located; Provided, however, That such shares and such accounts held by the United States government or any of its agencies shall not be included in determining the assessment. The real and actual value of such capital, represented by the market value of such investment shares and investment accounts as aforesaid, shall be ascertained according to the best information which the assessor may be able to obtain whether from any return made by such association to any officer of this state or the United States, from actual sales of such investment shares and investment accounts, from answers to questions by the assessor, as hereinafter provided, or from other trustworthy sources."

Paragraphs 2 and 3 of the section go into further detail as to the duties of the officials of such associations, the assessment of its real estate, and other details not necessary to consider here.

We do not understand that appellants question either the intent or the power of the legislature to fix the methods of assessment of the particular type of property owned by building and loan and federal savings and loan associations. The power of the Legislature to enact such a statute seems clear, and has been exercised in a number of instances. For example, Code, 11-6, as amended, covers the assessment of the property of public service corporations; Code, 11-3-12 and 13, prescribes how the property of other corporations shall be assessed; Section 14 of the same article, as amended by Chapter 40, Acts Regular Session, 1933, provides for the assessment of the property of banking institutions; Section 15, as amended by Chapter 40, Acts Regular Session, 1933, covers the assessment of the property used in trade or business by natural persons. Therefore, when the legislature enacted Chapter 118 of the Acts of 1939, it only added to existing statutes covering the assessment of various types of property, and created no innovation on former practices. Even if it had done so, Section 1, Article X of the Constitution gives the legislature power to direct how the

value of any class of property shall be ascertained, and this power has been expressly upheld by this Court in *Charleston & Southside Bridge Co. v. Kanawha County Court,* 41 W. Va. 658, 24 S. E. 1002.

But we do not understand the appellants to contend that, admitting the power and efficacy of the legislative enactment of 1939, the same cannot be administered as directed, where to do so would discriminate against owners of other property of the same class in the same taxing district. This in reality is the paramount question presented on this appeal.

Appellants have produced testimony tending to show that other classes of property, such as real estate, oil and gas properties, automobiles and household goods are assessed at less than their true and actual value in Kanawha County. We think this testimony must be disregarded. The "equal and uniform" provision of our Constitution "means merely that as to classes of property, business or income there shall be uniformity of taxation". *Christopher v. James,* 122 W. Va. 665, 12 S. E. 2d 813, 816. See also *Charleston & Southside Bridge Co. v. County Court, supra;* in re *Hancock County Federal Savings & Loan Association,* 125 W. Va. 426, 25 S. E. 2d 543. But they also introduce evidence which shows the manner in which intangible personal property such as notes, accounts and certain types of bonds, as well as other types of Class I property are assessed. It is important at this point to ascertain just how these assessments are made, and, fortunately, we have the testimony of the chief deputy of the Assessor of Kanawha County, whose statement is clear and explicit as to the methods of assessment followed. After stating that live stock, property employed in and products of agriculture, money, notes, accounts receivable, and bonds other than government, state and municipal, and shares of building and loan associations are treated as Class I property, his examination follows:

> "Q. In issuing your instructions to your field
> deputies will you state how you instruct
> them to value the various types of prop-

erty which you state are in Class 1? What method or plan is used?

"A. Money is valued, of course, at 100%; accounts receivable are valued at about 70% unless they are installment accounts, and they are valued at approximately 65%.

"Q. You mean installment accounts are valued at 65%?

"A. Yes.

"Q. You mean 65% of their book value or the value shown on the face?

"A. Yes, the book values shown on the face of them.

"Q. How about other personal property such as livestock and agricultural products?

"A. Livestock is valued *as* approximately 50% of the purchase value.

"Q. How do you ascertain that purchase value in your instructions to your field deputies?

"A. By asking the farmer what he paid for a plow or cattle *of* livestock, and also using their own judgment.

"Q. How about notes?

"A. Notes are assessed at approximately 70%.

"Q. How about bonds?

"A. Bonds are assessed at approximately 70% unless their market value is less. Then, of course, if the market value of bonds is less than 70% we generally factor them slightly under their market value.

"Q. But generally you take 70% of the face value?

"A. That is the usual general procedure, yes, sir.

"Q. Is that same system used throughout Kanawha County in all its magisterial districts by all of your field deputies?

"A. Yes, sir.

"Q. Is that done under your supervision?

"A. Yes, sir.

"Q. From whom do you receive your instructions?

"A. From Mr. Abbott, the Assessor of Kanawha County."

There is also testimony showing that the assets of certain loan companies, shown by the record to be commonly called "Small Loan Companies", as distinguished from commercial banks and trust companies are assessed at figures running from eighty-five to eighty-eight per cent of their face value. There is no showing as to the method employed in the assessment of the assets of trust companies and commercial banks, and we assume such assessments are made as directed by Code, 11-3-14, as amended by Chapter 40, Acts Regular Session, 1933. The testimony shows that the assessor in fixing the value of Class I property, employed a uniform and systematic plan as to the different types of property included in the general Class I classification. Therefore, no question of error of judgment is involved. What the assessor did was intentional and followed a preconcerted plan, and, this being true, is discrimination against the appellants clearly shown? Money is assessed at its face value, as are the assets of commercial banks, and as to them it cannot be claimed there is any discrimination one over the other, or against the appellants. It may be claimed that the method employed in the assessment of loan companies is discriminatory, but to sustain that claim appellants would have to concede that the securities held by such loan companies are of the same type, and as well secured as their own. That loan companies of the class mentioned are engaged in a business different from, and involving greater risk than that in which building and loan and federal savings and loan associations are engaged is well known and will not, we think, be disputed. We run into a situation impossible of solution when we attempt to make any comparison as between the assessments of live stock, agricultural equipment and farm products on the one hand, and secured assets of a bank or building and loan association on the other. When we come to assessment of notes and accounts, we think it clear, from the testimony of the deputy assessor, that what is done is assess them at sixty-five to seventy per cent of their face value as reported to the assessor. Bonds are assessed at seventy per

cent of their face value, unless their market value is less, and then at a figure slightly under their market value. In view of all this, can it be said that there has been such discrimination as justifies the complaint of the appellants.

That the assets of the appellants are made up of high-grade securities will not be denied. There is and can be no reasonable doubt as to their being worth one hundred per cent of their face value. No one can question values based on securities of the Government of the United States. When we come to their chief business, that of lending money on real estate, we must consider that every loan is made upon fair appraisement of real estate; the loans are confined to a percentage of the appraised value of such real estate, in order to guard against fluctuation in value; the property on which the loans are made is insured against destruction by fire and otherwise, and, generally, every possible step taken to secure the solvency of every dollar of such assets. In addition their business is subject to the rigid and constant supervision of the State or Federal Government, or both, and their solvency at all times is a mandatory requirement for doing business. Such a class of assets is, of course, clearly distinguishable from the ordinary run of notes and accounts. Of course, notes held by individuals, firms and corporations are, sometimes, equally well secured; but when we treat them as a class such statement does not hold good.

While our State Constitution requires uniformity and equality in taxation, no one has ever believed that either could be attained as a practical matter. The constitutional provision is a statement of an ideal, and is implemented by numerous statutes, all seeking to put into practice such ideal so far as is humanly possible. But do all we can, and attempt as rigidly as we may to enforce such statutes, we will fall far short of attaining equality, uniformity and justice in levying taxes. In the first place assessors often deliberately fail to perform their full duty; but their most sincere effort to perform such duty would not result in an assessment fair to everyone. For example,

who can know the exact value of an oil or gas well; or, to confine ourselves to Class I property, the value of a herd of cattle, or a flock of sheep, or agricultural implements; or how much will be realized from the notes and accounts of any business or individual. No one can escape the variations of financial fortune, and as to every note and account there is some risk. Then, delays in and costs of collection must be considered. No one can fix with certainty the real value of the great mass of property of all types and classes, and a certain amount of estimate and conjecture is inevitable.

In these circumstances assessors are warranted in adopting some reasonable plan for the valuation of types of property, the value of which may be affected by the considerations above mentioned. As to notes and accounts, assessors do not have the facilities to investigate the financial standing of debtors, and if they had, perfection could not be attained. They are driven to adopt some standard, and if they do so, and it is a reasonable one, the results of its application cannot be considered as a discrimination against owners of other property, the value of which can be more definitely determined, and is largely fixed by its very nature. The results may not be entirely fair to other taxpayers. In many instances notes and accounts worth full value may be assessed at less than their value and, in individual cases, a clear case of discrimination may be shown to exist. But this does not rise to the importance of general discrimination as between property of different types, even that within the same legal classification. It must be agreed that every effort should be made to avoid such instances of discrimination, and the use of the plan adopted by the Assessor of Kanawha County, and other assessors throughout the State, should be limited to cases where no better plan can be devised. Every assessor should feel the obligation to prevent discrimination between taxpayers to the fullest extent possible.

On the record before us, we do not believe a clear case of discrimination has been shown. No one contends that

the property of the appellants has been assessed in excess of its true and actual value. Appellants would not be permitted to do business if their respective assets were less in value than that reported to the assessor. State and Federal authorities would intervene, if such a situation existed. As has been stated above, the assets of each of the appellants were originally selected after the most rigid test as to its value, and care taken to guard against the fluctuation in values of properties securing such assets. Clearly, as relates to safety and security it is a different type of property from the ordinary note or account. Why, therefore, should we be asked to reduce an assessment below its true value, merely because as to other property, the value of which is uncertain, and by reason of its character cannot be accurately determined, assessing officers have, in good faith, adopted a plan for arriving at an estimated value?

Then, what evidence is there in the record that Class I intangible property, not covered by the type of property owned by the appellants, is assessed at less than its true value. Of course, appellants cannot, on account of practical difficulties, show that it is assessed at less than its value, and, for the same reason, the assessor cannot show the opposite. Neither the assessor nor the appellants know, or can by any reasonable effort ascertain, the true and actual value of the intangible Class I property in Kanawha County, represented by the common run of notes and accounts. If this be true, how can it be claimed that any discrimination was practiced. We do not have a case where the true and actual value was ascertained and a discount allowed from that value; but rather a case where the discount was allowed, particularly as to intangibles, in an effort to reach the true value. The more or less arbitrary allowance of the discount as to notes and accounts may have been an erroneous exercise of the duties of the assessor. We think it was. Some plan which would take into account the difference between the secured notes and unsecured notes and accounts could, and should be devised;

but mere error of judgment as to the plan adopted is not sufficient to establish discrimination, where the plan, though imperfect, is adopted in a good faith effort to secure fair and equitable assessment, and equality and uniformity in taxation.

Recent radical changes in our tax system, brought about by the adoption of the tax limitation amendment, Section 1 of Article X of our Constitution, whereby property is classified, gives rise to the suggestion that once property has been classified, there can be no further distinction as to property within a given classification. Whether there can be such distinction is perhaps dependent on the character of the property involved. Each of the four classifications of property for tax purposes includes property of different types, for the ascertainment of the value of which different methods are employed. In the very nature of things this must be true. The Constitution plainly says that the value of all property for tax purposes shall be ascertained "as directed by law". Who gives the direction? Obviously, the sole law-making authority, the legislature. In respect to building and loan and federal savings and loan associations, as well as other types of property, the legislature has given specific direction, and as to other types of property the directions are more general. We do not doubt the inherent and constitutional power of the legislature to give these directions, so long as they are designed to provide a method in keeping with the aim to tax property equally and uniformly, as required by our Constitution. So far as concerns our State Constitution, we think the question is set at rest by the decision of this Court in *Charleston & Southside Bridge Co.* v. *Kanawha County Court, supra.* That case was decided in 1896, when there was no classification of property for tax purposes, and uniform tax rates, in each taxing district, applied to all property. However, Section 1 of Article X of the Constitution, as it then was, contained the same provisions with respect to equality and uniformity as those contained in the present Constitution. In that case the plaintiff was the owner of a toll bridge,

and the legislature had provided a particular method for the assessment of toll bridges and ferries. Points 2, 3 and 4 of the syllabus read as follows:

"2. The legislature has power to prescribe the method by which the valuation of any class of property may be ascertained, and, where the value of the same class of property is ascertained throughout the state in the same manner, such valuation can not be regarded as unconstitutional for lack of uniformity or equality.

"3. The Constitution prescribes what property is to be taxed, and the legislature prescribes the manner in which it shall be taxed, which mode of taxation shall be equal and uniform as to all classes of property.

"4. A tax upon all business of the same class, which is uniform as to that kind of business, is not unconstitutional."

We know of no subsequent case which in any way departs from that decision. It was cited with approval in *Christopher* v. *James, supra.* The later classification of property does not, in our opinion, call for any departure from the principles therein pronounced. We think they are applicable to our present tax system.

Appellants strongly rely upon the case of *West Penn Power Co.* v. *Board of Review and Equalization,* 112 W. Va. 442, 164 S. E. 862. That case was decided in June, 1932, and related to the assessment of real estate, a specific type of property. It was there held, relying largely on *Sioux City Bridge Co.* v. *Dakota County,* 260 U. S. 441, 43 S. Ct. 190, 67 L. ed. 340, that "Under the Fourteenth Amendment of the Constitution of the United States, it is the right of a taxpayer whose property is taxed at one hundred per centum of its true and actual value to have his assessment reduced to the percentage of the value at which other properties of the same class in the same governmental unit of taxation are taxed, even though the statute requires that all property be taxed at its true and actual value." Many

other cases decided by the Supreme Court of the United States could be cited in support of this holding, among which are: *Raymond* v. *Chicago Union Traction Co.,* 207 U. S. 20, 28 S. Ct. 7, 52 L. ed. 78; *Greene* v. *Louisville & Interurban R. R. Co.,* 244 U. S. 499, 37 S. Ct. 673, 61 L. ed. 1280; *Louisville & Nashville Ry Co.* v. *Greene,* 244 U. S. 522, 37 S. Ct. 683, 61 L. ed. 1291; *Sunday Lake Iron Co.* v. *Wakefield,* 247 U. S. 350, 38 S. Ct. 495, 62 L. ed. 1154; *Bohler* v. *Calloway,* 267 U. S. 479, 45 S. Ct. 431, 69 L. ed. 745; *Cumberland Coal Co.* v. *Board of Revision,* 284 U. S. 23, 52 S. Ct. 48, 76 L. ed. 146; *Iowa-Des Moines National Bank* v. *Bennett,* 284 U. S. 239, 52 S. Ct. 133, 76 L. ed. 265. But the force and weight of these decisions, as applied to the present controversy, is largely, if not entirely, nullified by the recent decision of the same Court in *Nashville, Chattanooga & St. Louis Ry. Co.* v. *Browning,* 310 U. S. 362, 60 S. Ct. 968, 84 L. ed. 1254. In that case it was held that, "The Equal Protection Clause of the Fourteenth Amendment permits a State to classify the property of railroads and other public utilities separately from other property and to tax it higher", and also, "Where a State for many years systematically assessed the property of railroads and other utilities at full cash value and all other kinds of property at less than cash value, held that the practice was the 'law' of the State, within the meaning of the Equal Protection Clause of the Fourteenth Amendment, although uniformity of taxation was commanded by the state constitution, and although it were true that the tax in question was sustained by the State Supreme Court by a resort to fiction." We understand this case to hold that none of the cases decided by the Supreme Court of the United States, cited above, were meant to prevent a state from applying different yardsticks to different classes of property; and, applying this principle, we would say it would be no violation of the equality and uniformity clause of either the State or Federal Constitution to apply a different yardstick to different types of property in the necessary ascertain-

ment of the value thereof for tax purposes. The cases last cited above are distinguished, and we think that, as the law now is, appellants can find no support for their contentions under the Fourteenth Amendment of the Federal Constitution. The *Browning* case involved the assessment of a railroad, but the principle announced applies to assessments of all types and classes of property by a state or its political subdivisions. Under that decision, it is doubtful whether the ruling of this Court in the *West Penn* case could now be sustained by sole reliance on the Fourteenth Amendment.

We are not persuaded that the ruling in the *West Penn* case, basing the same on our State Constitution, requires us to hold with the contention of the appellants in the case at bar. As stated above, that case involved real estate. There was clear discrimination, because it was apparently admitted that, in assessing real estate in Brooke County, approximately twenty per cent was taken from the true and actual value thereof, and the assessment fixed at eighty per cent of such value; whereas, as to the property of the West Penn Power Company, that reduction was not made, and its real estate was assessed at its true and actual value. There could, of course, be no just excuse for that character of discrimination, and the only question before the Court was whether the legislative direction, to assess property at its true and actual value, should or should not give way to the constitutional requirements of equality and uniformity. It was decided that, under the Fourteenth Amendment of the Federal Constitution, the constitutional requirements were paramount, resulting in a reduction of the West Penn Power Company's property to eighty per cent of its value. It would, perhaps, be out of place to discuss the wisdom of that decision, because we do not think it controlling in the case at bar. It may be that the principles of that case are sound, and that under our Constitution, without reliance on the Fourteenth Amendment, we should adhere thereto. But where do they lead us? An assessor violates the law, and a portion of the taxpayers receive an

advantage from such violation. When this occurs, other taxpayers naturally feel that they should be accorded the same treatment. Must the courts insist on, require and direct other violations of law by tax officials? Suppose next year the assessor of any county, or of all the counties of the State, decides to assess real and personal property of individuals at fifty per cent of its true and actual value, would not the owners of public utilities, banks, building and loan associations and federal savings and loan associations be entitled to the same treatment? Is it not time to find some remedy for this situation, other than one involving an appeal to the courts to enforce a system of assessments for tax purposes which is plainly in violation of the law as written? It would be refreshing, indeed, if some taxpayer, or a group of taxpayers, would sponsor an effort to see that our tax laws are obeyed, rather than to take advantage of their open violation. It is not for this Court to point out ways by which regard for law may be required of public officials, but they exist. It is probably too much to expect that they will ever be used.

The case before us does not involve the assessment of real estate, but a type of property of a peculiar nature and as to which the legislature has exercised its power to direct how it shall be assessed, and as to which different methods of ascertaining values must be employed, even as between types of the same constitutional classification. The assessor, we may assume, has in good faith, made an effort to ascertain the value of intangible property in Kanawha County, other than that owned by appellants. It is entirely different from a case where the same type of property, requiring the same methods of ascertaining the value, is involved, and where one taxpayer's property of the same type is assessed at its true and actual value and another taxpayer's assessed at a lower figure. It is understandable how a court in such a case might feel disposed to favor a taxpayer, even at the risk of encouraging violations of plain statutory law by taxing authorities. Discrimination in the assessment of

property of the same type, in the same taxing district cannot be defended, and we do not mean to defend such a practice in any sense. We think money and solvent securities should be assessed at their face value, and we think the arbitrary practice of allowing a certain reduction from the face value of notes and accounts should be discontinued so far as possible, although we realize that some plan of estimating value must be followed in a great many instances. Our holding goes no further than this: What has been shown with reference to the assessment of intangible property in Kanawha County, of types other than that owned by the appellants, is insufficient to establish a case of discrimination, which would justify us in applying the principles announced in *West Penn Power Co.* v. *Board of Review and Equalization, supra.*

In view of the fact that the Legislature has given specific direction as to the assessment of the property of the appellants, and the assessments were made in conformity with such direction; and further that there has been no clear showing of discrimination, to the prejudice of the appellants, in the assessment of intangible property in Kanawha County, the order of the circuit court of said county, complained of, is affirmed.

*Affirmed.*