First Federal Savings And Loan Association of Puerto Rico, Plaintiff and Appellant, *v.* José R. Noguera, Secretary of the Treasury of Puerto Rico, Respondent and Appellee.

No. 214. Decided September 20, 1962.

*Brown, Newsom & Córdova* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Genoveva R. Carrera, Assistant Solicitor General,* for appellee.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

The Secretary of the Treasury notified the savings and loan association named "First Federal Savings and Loan Association of Puerto Rico", petitioner herein, a tax assessment on personal property. The petitioner disagreed with the tax imposed on it on the ground that its property is exempt from same pursuant to § 5(h) of the Federal Home Owners' Loan Act of 1933, 48 Stat. 128, 12 U.S.C.A. § 1464(h), and filed a complaint before the Superior Court. The latter upheld the validity of the tax.

In view of the allegations that follow, it is fitting to make clear at the beginning that the power of the Congress of the United States to exempt the instrumentalities of the Federal Government from taxation, is not at issue in this case. It is well known that Congress has the power to determine, within the limits of the Constitution, to what extent its instrumentalities shall enjoy immunity from taxation. *Federal Land Bank* v. *Kiowa County,* 368 U.S. 146, 149 (1961); *Carson* v. *Roane–Anderson Co.,* 342 U.S. 232 (1952); *Cleveland* v. *United States,* 323 U.S. 329 (1945); *Maricopa County* v. *Valley National Bank,* 318 U.S. 357 (1943); *Federal Land Bank of St. Paul* v. *Bismarck Lumber Co.,* 314 U.S. 95 (1941); *Pittman* v. *Home Owners' Loan Corp.,* 308 U.S. 21 (1939); *Graves* v. *New York ex rel. O'Keefe,* 306 U.S. 466 (1939); *Des Moines National Bank* v. *Fairweather,* 263 U.S. 103 (1923); *First National Bank* v. *Adams,* 258 U.S. 362 (1922); *Owensboro National Bank* v. *Owensboro,* 173 U.S. 664 (1899).

■ The issue revolves on whether or not the above-mentioned § 5(h) of the aforesaid Act of Congress exempts the savings and loan associations incorporated or which might be incorporated under the above-cited Act from the taxes imposed or which might be imposed by the Commonwealth of Puerto Rico. Let us turn presently to the text of the statute. In so far as pertinent, said § 5(h) reads as follows:

"No State, Territorial, county, municipal, or local taxing authority shall impose any tax on such associations or their franchise, capital, reserves, surplus, loans, or income *greater than* that imposed by such authority on other similar local mutual or cooperative thrift and home financing institutions." 12 U.S.C.A. § 1464(h). (Italics ours.)[1]

Petitioner's position before us is tripartite. It raises the following three contentions: (1) That it (the petitioner) is an instrumentality or agency of the Federal Government and, therefore, is exempt from state taxation; (2) that the power granted by the afore-cited § 5(h) to the states and other local authorities to impose taxes on the federal savings and loan associations (such as the petitioner) does not operate in Puerto Rico because no local institution similar to petitioner exists here; and (3) that the above-mentioned power granted by § 5(h) does not operate in Puerto Rico because an institution similar to the petitioner exists here, namely, the Puerto Rico Government Employees Association, which is exempt from taxation.

Thus, in its first contention petitioner maintains that *there is no* taxing power on the part of the Commonwealth in this case. In the second argument it acknowledges that *there is* said taxing power, but alleges that it does not operate because in Puerto Rico there *does not exist* a local institution similar to it. In its third contention it also admits that there is the taxing power, but alleges that it does not operate be-

---

[1] Because it expressly so provides, this act is applicable to Puerto Rico. 48 Stat. 134 (1933); 12 U.S.C.A. § 1466.

cause there *exists* in Puerto Rico a local institution similar to it, which is exempt from taxation. "Allegans contraria non est audiendus" the Romans used to say, but let us proceed in view of Rule 6.5 of the Rules of Civil Procedure.

1. As to contention number 1 above-mentioned, the truth is that the Commonwealth has the right to tax. The reading of the statute convinces us thereof. Upon approving the act on those terms, Congress expressly authorized the states and the other local taxing authorities to impose taxes on those federal savings and loan associations provided such taxes are not greater than those imposed on similar local institutions, that is, those incorporated under state laws. It is likewise acknowledged and explained by a well-known author in the field of savings and loan associations, RUSSELL, Savings and Loan Associations 570–71,[2] (M. Bender & Co., N.Y., 2d ed. 1960).

██ The cases have consistently upheld the foregoing construction. Several kinds of state and local taxes imposed on federal savings and loan associations have been upheld by the courts. It is proper to make clear that within the context of the act of Congress involved herein and that of this opinion, as well as of the case law we shall cite, when the term "federal" savings and loan association is used, what the word "federal" means is that those associations are incorporated under the above-mentioned federal Act and not under a state law. It does not mean that those institutions are property of the Federal Government nor that its officials and employees are in the payroll of said government. Conversely, when the

---

[2] "... Congress, however, has granted the state the right to tax such institutions provided it is done uniformly at the same rate that similar state institutions are taxed... Stated positively, the meaning (of section 5-h) would be that any state may impose any such tax on federal associations, provided any such tax is not greater than the tax or taxes imposed on similar state institutions. In the absence of a specific exemption, the provision appears to authorize almost any form of nondiscriminatory tax; ... Not being federally owned, federal savings associations are naturally subject to such state taxes." RUSSELL, *op. cit.*

cases speak of state savings and loan associations, they refer to associations incorporated under state legislation.

Examples of that case law to which we have referred in the preceding paragraph and which is in accord with what we are deciding are the following cases: Capital tax, *State v. MacCorkle*, 123 S.E.2d 888 (1962); property tax, *Charleston Federal Savings and Loan Association* v. *Anderson*, 30 S.E.2d 513 (1944), affirmed in 324 U.S. 182, 89 L. Ed. 857 (1945); *Charleston Fed. Sav. & Loan Ass'n* v. *James*, 200 S.E. 845 (1939); and *In Re Hancock County Fed. Sav. & Loan Ass'n*, 25 S.E.2d 543 (1943); income tax, *State* v. *Minnesota Fed. Sav. & Loan Ass'n*, 15 N.W.2d 568 (1944); franchise tax, *First Fed. Sav. & Loan Ass'n* v. *Johnson*, 122 P.2d 84 (1942); employment security, *Texas Unemployment Compensation Commission* v. *Metropolitan Building*, 139 S.W.2d 309 (1940).

 The savings and loan associations, although technically not banks, have several purposes and procedures similar to those of banks. In some respects the difference between those associations and the banks is factual and in others it is rather a matter of terminology. Said associations do not accept "deposits," but people may entrust their savings to them. Depositors are not "creditors" but rather "shareholders" or "members". Although the associations may demand previous notice from the shareholders for the withdrawal of funds, the general practice is that the latter may withdraw them whenever they wish as if it were a checking account. *Porter* v. *Aetna Casualty Co.*, 370 U.S. 159, 161 (1962). Shareholders do not receive "interest" but "dividends". The associations do not issue "manager's checks" but they issue "money orders".

The act which authorizes the organization and incorporation of federal savings and loan associations states that those associations may be organized in order to provide local thrift institutions and home-financing institutions. 12 U.S.C.A.

§ 1464 (a). Some courts have stated that those associations are instrumentalities of the Federal Government. It seems that they so presume because said associations are incorporated under an act of Congress.[3] On the other hand, other courts have held that those institutions are not instrumentalities of said government.[4] In *Texas Unemployment Compensation Commission, etc.*, cited in footnote 4 of this opinion, the problem was raised and analyzed carefully and realistically. The court found that said associations are not instrumentalities of the Federal Government.

This second alternative seems more convincing for the following reasons:

(a) The act itself which authorizes the creation and incorporation of those savings and loan associations nowhere states that they are agencies or instrumentalities of the Federal Government.

(b) The mere fact that they are incorporated under a federal act and that they are under the supervision of a federal agency (the Federal Home Loan Bank Board) does not automatically make them instrumentalities of the Government of the United States just as commercial banks incorporated under the state Banking Law and which operate under the supervision of the Secretary of the Treasury are not instrumentalities of the state government.

(c) Those associations are not created through an act of Congress. What the federal act does is to permit its organization or incorporation in the same manner that state banking and private corporation laws do not create the banks nor

---

[3] *United States* v. *Harper*, 241 F.2d 103, 105 (1957); *People of State of California* v. *Coast Fed. Sav. & Loan Ass'n*, 98 F. Supp. 311, 316 (1951); *State* v. *Minnesota Fed. Sav. & Loan Ass'n*, 15 N.W.2d 568, 573 (1944).

[4] *Texas Unemployment Compensation Commission* v. *Metropolitan Bldg. & Loan Ass'n*, 139 S.W.2d 309, 312–14 (1940); *First Federal Sav. & Loan Ass'n* v. *Johnson*, 122 P.2d 84, 86 (1942); *Capitol Bldg. & Loan Ass'n* v. *Kansas Commission of Labor*, 83 P.2d 106 (1938); *North Carolina Unemployment Commission* v. *Wachovia Bank & T. Co.*, 2 S.E.2d 592 (1939).

the private corporations, but permit their organization and incorporation and provide their regulations by the state for reasons of public interest.

(d) Those associations are not property of the Federal Government, nor are their officials and employees, officials or employees of said government.

(e) A strong evidence that Congress itself did not regard them as instrumentalities of the government is the fact that in its own Act (§ 5) it specifically authorized states to tax them with the afore-mentioned limitation, which we will explain further on. Contrariwise, when Congress has created federal banks it has specifically granted them immunity to state taxation. *Federal Land Bank* v. *Bismarck Lumber Co.*, 314 U.S. 95, 86 L. Ed. 65 (1941); Annotation, 86 L. Ed. 72.

(f) Said institutions are voluntarily organized by private citizens, operate for profit and compete with state savings and loan associations. For instance, in its *Annual Report* of 1961, the petitioner informs its members as follows:

"Once more there has been registered a considerable increase in the income and profits of the association in comparison with former years. The gross income reached the figure of $4,657,762.69 and exceeds that of last year by the sum of $801,928.69 which, until that date had been the highest in our history and which is equivalent to an increase of 20.8 percent." (Page 9.)

"During 1961 the association paid to its depositors dividends for the sum of $2,162,684.30, which constitutes an increase of $299,713.96 over last year, a progressive increase which has been maintained through our thirteen years' existence not only with respect to the amount of dividends paid, but also to the rate of interest thereof.

"As you already know, our association constitutes a cooperative in which the depositors are the beneficiaries of the profits obtained by the association, which profits are used entirely for the payment of dividends once operating and administration expenses and the amount which by regulation must be put in reserve, have been deducted." (Page 12.)

"With this new acquisition (the building of the Barrio Obrero Branch in San Juan) the association becomes the owner of the buildings occupied by three of its four branches, to wit: Muñoz Rivera Avenue in Río Piedras; De Diego Street in Río Piedras, and Barrio Obrero. The depreciated value of these buildings including the site of our main office amounts to $2,334,446.14. Its real market value may be very conservatively estimated in excess of $3,000,000.

"The construction of our new building confronted us with the need of making a decision as to the old building on Ponce de León Avenue and Alianza Street, deciding that it was to the best interest of the association to sell the same and it was sold with a small profit shortly after we moved." (Page 13.)

In view of this reality, it is difficult to believe that petitioner is an "agency or instrumentality of the Federal Government".

It is true that the law provides that those associations will be members of the Federal Home Loan Bank and may be used by the Federal Government as its fiscal agents (they could perform such duties as receiving payments on behalf of the government, be depositors of federal funds, etc.), but only when the Secretary of the Treasury of the United States so designates them. 12 U.S.C.A § 1464 (f) and (k). However, this fact alone does not make them instrumentalities of the government. The fact that the act grants authority to the Secretary of the Treasury to designate any of those associations as fiscal agents of the government, ipso facto (there are thousands in the United States)[5] does not make them all agencies or instrumetalities of the government.

As stated in *Texas Unemployment Commission* v. *Metropolitan, etc., supra*, pp. 312 and 313, the courts have held that member state banks of the Federal Home Loan Bank or of the Federal Reserve System and which by virtue thereof are required to act as fiscal agents of the Federal Government are not federal instrumentalities. Furthermore, such

---

[5] RUSSELL, *op. cit.*, 145.

federal savings and loan associations render no different service for the Federal Government from that required of the state-created savings and loan associations which become members of the Federal Home Loan Bank and said state associations have not been considered to be instrumentalities of the Federal Government.

■ It might be important, for the purposes of this case, to decide whether or not petitioner is a federal instrumentality, if Congress would have kept silent as far as the imposition of state taxes is concerned, but Congress decided the issue expressly authorizing the imposition of said taxes in § 5 (h) of the Act. Therefore, it is unnecessary that we decide said question since the outcome of this case would be the same in either case. Whether or not petitioner is considered a federal instrumentality, state taxation is permitted by virtue of § 5 (h) above-cited. *State* v. *Minnesota Fed. Sav. & Loan Ass'n, supra; People of State of California* v. *Coast Federal Savings & Loan Ass'n*, 98 F. Supp. 311, 319 (1951). We have deemed it convenient, however, to discuss at length in order to clarify the question raised by petitioner in this respect.

We also conceive that under specific circumstances and in the discharge of its duties as agent of the Federal Government, thus expressly designated by the Secretary of the Treasury, one of those associations, or several, as the case may be, be or should be considered an instrumentality of said government for specific purposes. But that would certainly not be the case as to state taxes, because, as we have seen, the federal act itself authorizes them.

2. Petitioner's second contention consists of the allegation that taxation does not lie because there do not exist in Puerto Rico local institutions similar to it. The contention is wrong for three reasons. First, to uphold that position would be tantamount to adding to the federal act a condition which Congress did not include therein. Second, in strict logic the

contention is fallacious, since the state is not imposing on petitioner any tax greater than that which it is imposing upon similar local institutions because, as petitioner points out, these do not exist. We remember that one of the great masters teaches that the life of the law has not been logic,[6] but, may we add, it has not been fallacy either.

■ Third, said contention entirely disregards the purpose of the condition or limitation prescribed by Congress in the above-cited § 5(h). In providing that state taxes imposed upon federal savings and loan associations could not be greater than those imposed on similar local institutions, the purpose of Congress was to protect federal associations from possible discriminatory taxation on the part of the states against said federal associations and in favor of state associations. Its purpose was not to grant them tax exemption. *Laurens Federal Savings & Loan Ass'n* v. *South Carolina Tax Comm.*, 365 U.S. 517, 5 L. Ed. 2d 749, 752 (1961) ; *State* v. *Minnesota Federal Savings & Loan Ass'n, supra*, page 573; *First Federal Savings & Loan Ass'n* v. *Johnson, supra*, page 88; RUSSELL, *op. cit.*, 571.[7]

■ The intention of Congress to protect federal associations from discriminations by the states tending to favor state associations, does not arise whimsically. It is based on experience and on the history of the relationship between the states and banking institutions incorporated by or under federal legislation since the beginning of the republic. On previous occasions the states had taken retaliatory and discriminatory measures against banking organizations incorporated by virtue of Congressional legislation.

It will be remembered that the first bank in the United States was incorporated by Act of Congress in 1791, mainly

---

[6] HOLMES, *Common Law* 1 (1946 ed.).

[7] "The purpose (of section 5-h) was to protect federal associations from discriminatory taxation which would put them on any less favorable basis than state building and loan associations." *State* v. *Minnesota Fed. Sav., etc., supra*, p. 573.

due to the efforts of the Secretary of the Treasury, the Antillean Alexander Hamilton, and in spite of the opposition of the Secretary of State, Thomas Jefferson, Congressman James Madison, and the Attorney General, Edmund Randolph.[8] Until the Civil War the controversy on national banks was kept alive although sometimes submerged under other more urgent problems. When the 20-year franchise of the Bank of the United States was about to expire the state banks assumed the leadership of those that opposed Congress from renewing its franchise. The opponents of the national bank were successful and said bank had to close its doors when the franchise expired in 1811.

An example of how the feeling ran at that time on that issue is the resolution approved by the Legislature of Pennsylvania "instructing" the senators and representatives of that state in Congress "to use every exertion, in their power, to prevent the charter of the Bank of the United States from being renewed, or any other bank from being chartered by Congress, designed to have operations within the jurisdiction of any state, without first having obtained the consent of the legislature of such state."[9] The leaders in the controversy were, among others, John Calhoun, Daniel Webster, John Randolph, Madison and Henry Clay, some of whom, like Webster and Clay, entirely changed their positions through the years that followed.

Mainly because of the needs which arose as a result of the war with Great Britain, those in favor of the national bank again prevailed in Congress and they approved a new act incorporating in 1815 the second Bank of the United States, which Madison vetoed, but signed it the following year.[10] The resentment on the part of the states was such

---

[8] 1 Stat. 191 (1791); SWISHER, American Constitutional Development 72 (2d ed. 1954).

[9] *American State Papers*, VIII. Finance, II, p. 467, cited in SWISHER, American Constitutional Development 171 (2d ed. 1954).

[10] 3 Stat. 266 (1816).

that many approved legislation hostile to the new Bank of the United States. For example, Indiana provided in its constitution that any bank chartered outside the state could not do business within its borders. Illinois, also by constitutional provision, forbade the establishment of any but state banks. In Tennessee the Legislature enacted a law imposing high yearly duties on any bank not chartered under its authority for the privilege of banking within said state. Similar economic reprisals were taken by the Legislatures of Kentucky, Ohio, Georgia and Maryland. The purpose of these measures was to make it impossible for the Bank of the United States to operate in those states and thus defeat the intention of Congress.[11]

Upon mentioning the state of Maryland in connection with that political and economic controversy, we immediately recall the famous *McCulloch* v. *Maryland* case, decided in 1819,[12] which arose from that controversy. In his opinion, Marshall, upon explaining the implied powers of the Federal Government, employed to a great extent the arguments used by Hamilton in 1791 when he was Secretary of the Treasury in his opinion to the President recommending that he sign the act for the first Bank of the United States. On that occasion the President, in view of the importance of the matter and of the controversy it had originated, requested the opinions of his Attorney General, Randolph, of his Secretary of State, Jefferson, and of his Treasurer, Hamilton.[13] As is known, that case concerned an entity which was a creature of Congress, whose purposes were eminently governmental and which was an instrumentality of the Federal Govern-

---

[11] IV BEVERIDGE, Life of John Marshall 206–208 (4 Vols., 1916–1919); I CHARLES WARREN, The Supreme Court in United States History 505–506 (rev. ed., 2 Vols., 1926); SWISHER, *op. cit.*, 173–74.

[12] 4 WHEATON 316. For some interesting comments on this case, see IV BEVERIDGE, *op. cit.*, Chap. 6; I WARREN, *op. cit.*, Chap. 12; SWISHER, *op. cit.*, 174–78.

[13] IV The Works of Alexander Hamilton 104–138 (D.C. Hamilton ed., 7 Vols., 1850–1851); SWISHER, *op. cit.*, 72–74 and 176–77.

ment. The decision of the Supreme Court was very controversial and roused profuse and strong pro and con expressions among the newspapers, lawyers and politicians of that time.[14]

The controversy on the Bank remained dormant and exploded again near the expiration date of the franchise, which was also for 20 years, of the second Bank of the United States. Andrew Jackson had been President since 1829 and if he were re-elected it would correspond his administration to decide whether or not the Bank's franchise would be renewed. When those in favor of the Bank were convinced that Jackson did not favor the renewal, they started campaigning against Jackson and in favor of his opponent Henry Clay. The Bank itself was involved actively, and at times improperly, in the political campaign.[15] Jackson was elected for a new term, but not so the Bank, which ceased to exist when its franchise expired in 1836.

It is unnecessary to continue with the historical background. To conclude, it will suffice to say that serious banking and currency problems which again made crisis during the Civil War were involved in that political controversy. A system of national banks different from the concept underlying the two former experiments was then created.[16] Said system operated until 1913 when it was substituted by the present system (Federal Reserve System), established during President Wilson's administration.

Naturally, we are not taking sides on the historical controversy. Besides, the case of federal savings and loan associations is different; they are the product of another era, of other legislation based on different premises, and are not national banks but, as we have seen, institutions of a different nature. Nevertheless, when their incorporation under the

---

[14] I WARREN, *op. cit.*, 511–540; IV BEVERIDGE, *op. cit.*, 309.

[15] SWISHER, *op. cit.*, 180–85.

[16] DAVIS, *The Origin of the National Banking System*, Senate Doc. 582, 61st Cong. 2d Sess., 1910; 12 Stat. 665.

federal act in 1933 was authorized, there already existed the state associations in the different states, and in view of the possible and perhaps probable state discrimination, Congress deemed it necessary to include in the law the protection discussed above.

3. Petitioner's third and last contention is based, contrary to that alleged in the second, on the fact that there exists in Puerto Rico an association similar to the "First Federal Savings and Loan Association", namely, the Puerto Rico Government Employees Association which is exempt from taxation and that, therefore, petitioner is also exempt pursuant to the provisions of the above-cited § 5 (h). This contention is little less than frivolous. The Puerto Rico Government Employees Association [17] is "a *public* institution, *compulsory* upon all permanent public employees and officials" of the Government of Puerto Rico, "the purposes of which shall be to stimulate saving among its members and to insure them against physical disability or death, to make loans, to provide them with homes and clinics for medical treatment for themselves and their families, and any other activity which the board of directors may, after study, deem beneficial and adequate for the purposes hereof, subject to the laws which govern said association; and to promote by all available means and resources the betterment and individual and collective progress of the members thereof in the economic, moral and physical orders, for which purpose the directing body of said association is hereby granted the necessary powers and authority to prescribe regulations and to adopt the resolutions indispensable therefor, including the fixing and collection of uniform quotas for medical services." (Italics ours.) 3 L.P.R.A. § 831.

The Act which creates said Employees Association orders the deduction of a monthly quota from the salaries of all permanent public employees and officials, which sums are set aside by the Secretary of the Treasury to constitute the

[17] That is its new name. 3 L.P.R.A. § 831, 1961 Supp.

Savings and Loan Fund. Said institution is governed by a board of directors in which, by operation of law, each of the three branches of government, the legislative, executive and judicial have representatives. The act also has specific provisions as to applications for and approval of loans, life and disability insurance, leave of absence deductions, the appointment of its Secretary–Accountant and other personnel, etc. 3 L.P.R.A. §§ 831–861. The great difference between these two institutions is clear. *Cf. State* v. *Minnesota Fed. Sav. & Loan Ass'n, supra,* in which for tax purposes also, the much less obvious differences between federal savings and loan associations and some credit unions organized under the state law of Minnesota, was upheld.

We conclude that petitioner is not exempt from the payment of property taxes and, therefore, the trial court did not err in so holding. The judgment rendered in this case by the Superior Court, San Juan Part, on August 28, 1959, will be affirmed.