# Board of Sup'rs of City of Frankfort et al. v. State Nat. Bank of Frankfort.

Oct. 19, 1945.

Marion Rider for appellant.

Allen Prewitt for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER--
Affirming.

Pursuant to the authority granted by Kentucky Revised Statutes 136.270, the City Assessor valued the 1,000 shares of stock of the State National Bank, of Frankfort, as of September 15, 1942, at $228,620, that being the book value, i. e., the net capital stock, surplus and undivided profits of all the shares. The statutory processes for review having been followed through, the Circuit Court adjudged the taxable value to be $120,000. The City insists on the appeal that the original valuation is the proper one.

We pause to observe that this is unique taxation. A banking institution pays no taxes upon its personal property, including intangibles. Instead it pays this tax upon the fair cash value of its stock, less the assessed value of its real property in the state, "for and on behalf of the owners of the shares of stock." KRS 136.270. The tax is one against the stockholders, the bank being their agent with the right of reimbursement. City of Shelbyville v. Citizens Bank of Shelbyville, 272 Ky. 559, 114 S. W. 2d 719, The bank is exempt from the imposition of any other state tax, KRS 136.070, and individual shareholders make no return and pay no tax upon their shares as do the owners of stock in other corporations, except where the particular corporation pays ad valorem taxes to Kentucky on at least 75% of its total property, less tax exempt securities. KRS 136.030. But the shares of stock in a banking institution are expressly made subject to local ad valorem taxation by the respective counties and cities to a maximum of 20 cents each and by school districts to a maximum of 40 cents on the hundred dollars, KRS 136.270; Jones v. Citizens' Bank of Hartford, 228 Ky. 699, 15 S. W. 2d 468, while intangibles of other owners are generally exempt from local taxation. KRS 132.-200 (6). However, while the tangible personal property of a bank is subject to the maximum rates stated, that of other corporations and individuals is, generally speak-

ing, subject to a much higher rate for local taxation; e. g., in the City of Frankfort for the year involved it was $2.25. The Congress early sanctioned the imposition of a tax by a state upon shares of stock in national banks. 12 U. S. C. A. sec. 548; Cooley on Taxation, sec. 992, 997. It is well settled that taxing the shares of the bank in the hands of the owners has exclusive relation to their distinct value and that they are taxable without regard to capital or the value or character of the property owned by the bank. Cooley, Secs. 974, 976; Evansville Bank v. Britton, 105 U. S. 322, 26 L. Ed. 1053. The tax, therefore, rests on the severability or independence of the shares from that property and its value. Commonwealth v. First National Bank, 67 Ky. 98, 96 Am. Dec. 285, affirmed, 76 U. S. 353, 9 Wall. 353, 19 L. Ed. 701; McFarland v. Georgetown Nat. Bank, 208 Ky. 7, 270 U. S. 995, affirmed, 273 U. S. 568, 47 S. Ct. 467, 71 L. Ed. 779.

The term "fair cash value" of property as used in the taxation statutes is defined by Section 172 of the Constitution as being an estimate of "the price it would bring at a fair voluntary sale." The question is: What would the property have sold for on the day of assessment in the ordinary course of trade? The answer may be easy where there have been recent sales sufficient in number and substantial in diversity and volume, for they afford the best evidence upon which the estimate can be based. Yet, the conditions surrounding even such sales may lessen the weight. Thus, if there had been a vigorous contest for control of a particular bank, the sales and purchases would be abnormal and the values artificial. So other factors enter into the equation and must be placed in the formula and given consideration in each particular case. Exactness cannot be obtained. Indeed, it is not required, for the Constitution and the Statutes recognize that only an approximation or estimate is possible. Yet, if property of like character has been sold at a fair voluntary sale, it shows what the market value of all of it is for the market is fixed by what is sold and not by what is not sold. But where there is no active market and no satisfactory market value established, those charged with responsibility of estimating the value must struggle along and do the best they can by somewhat rough-and-ready reasoning from the available elements and factors which ordinarily enter into market values.

We have had three cases which are prototypes and precedents. In Greensburg Deposit Bank v. Commonwealth, 230 Ky. 798, 20 S. W. 2d 979, the evidence of sales of shares of the bank stock was meager. It was confined to isolated transactions and related principally, if not wholly, to the book value. That was accepted as the taxable value in the absence of any other substantial criterion. On the other extreme are Board of Supervisors of Somerset v. Farmers Nat. Bank of Somerset, 293 Ky. 157, 168 S. W. 2d 371, and Larue County Board of Supervisors v. Lincoln National Bank of Hodgenville, 300 Ky. 7, 187 S. W. 2d 819, where the sales of bank stock over a substantial period of time and near to the assessing day were of such character, frequency and volume that the maximum prices at which the stock had sold were deemed the best evidence of market value and to establish the taxing value with reasonable certainty. This was so although the book value in the one case was two-thirds as much more and in the other one-half as much more as the sale price. Intermediate of these conditions is Dumesnil v. Reeves, 283 Ky. 563, 142 S. W. 2d 132, which involved the assessment of shares of stock in commercial corporations for purposes of inheritance taxes. As to one company there were estimates of auditors varying from $90 to $150 a share, based upon book valuation (the face of which was $231), previous assessments upon stock held by other persons, and the sale of 161 shares within seven years for the high price of $115 a share. There were only 46 shares out of a total of 6,000 sold within three years of the assessing date. We thought the fair book value was shown to be more than $150 a share and that the transactions in the stock were insufficient to establish the fair market value, although they should be considered in connection with the other evidence. The State Tax Commission upon all the evidence had valued the stock at $125 a share. That was confirmed by the Circuit Court. Since the burden had rested upon the taxpayer to establish the finding by the assessing officers to be wrong, and the mind of this court was left in doubt, the judgment fixing the valuation was affirmed.

In the case at bar the evidence presented by the bank to prove the valuation by the assessing officers to be erroneous was that the highest price ever paid during the life of the bank was $180 and over the recent period of seven years the highest price paid for the stock was $120

and the lowest $100 a share. From July 1, 1939, to December 31, 1942, there were 62 sales of an aggregate of 246 shares. Included are 38 sales of 148 shares in 1940, two sales of 180 shares in 1941, one sale of 21 in 1942, and one sale of 3 shares in 1943. The large number of transfers in 1940 seems to have been incident to the reduction of $50,000 in the capital stock, all involving numerous fractional shares. In 1934 the bank had been compelled to take considerable losses on loans and securities and to reform its capital structure. The sale in 1942 (within six weeks of this assessment date) was by another bank which had acquired the stock through default in payment of a note secured by it as collateral and which it had taken over at $120 a share. It sold the stock to an individual for the same amount. The stock of this bank is owned by 57 persons, among whom the shares are pretty well distributed. All the transactions, except three, were among the stockholders. Recently an owner, living out of Kentucky offered to sell his stock at $150 a share, but no buyer was found who would pay that much. There had never been a sale at public auction. All of the sales were through the bank or its president, who testified that he had acted as a voluntary clearing house or mutual broker for those desiring to sell and those desiring to buy, each having made inquiry of him of a prospective buyer or seller and sought his advice as to the price and worth. He denies there was any conspiracy or agreement that the price should be definitely fixed at $120, saying that that is what the officers and all others regarded the stock to be worth. There is no implication that these sales were not genuine and bona fide, but it is argued the price was controlled. Countervailing argument is that as the dividend rate has been $6 per share for a number of years, logically the market price of the stock has likewise remained constant. The bank's cash, loans and discounts, securities and real estate exceed its deposits liability by more than $260,000. However, the average net earnings over a period of 8 years was $17.80 a share. The earnings in 1942 were only $11.36 a share. The earnings after dividends were paid were used to pay off preferred stock issued in the strengthening of the capital structure during the period of financial depression. In recent years the deposits have largely increased, the amount in 1943 being double the amount in 1936. But the earnings have shrunk, the average rate on investments have fallen from

5.34% to 2.62%, due to a great decrease in loans and discounts because of reduced requirements of commercial and agricultural interests, coupled with competition of the Government as a lending agency, and a great increase in the bank's investments in low-rate Government securities. And the swollen deposits in all the banks of the country cannot be expected to remain.

Over against this evidence are the book valuation of $228, the earnings and the stability and continuity of $6 a share dividend, which, of course, represents 5% on a cost of $120 per share.

Dr. James W. Martin, of the University of Kentucky, a recognized economist and expert on taxation, and former Chairman of the Revenue Department of the State, gave interesting and enlightening testimony. He expressed the opinion that the present worth or value of the stock in this bank is $243,000. He reached this conclusion from the composite of several factors, the major ones being the property the bank owned, its earning power, the trend and stability of earnings, and their capitalization of 5%, 6% and 7%. It appears he counted in something for good will and the value as a going concern. He had a little regard for the book value, but would have deemed that wholly irrelevant except that some people or potential purchasers regard it of relevancy. He gave minor weight to the sale price because of the small number of shares involved, emphasizing the fact that there had been only one sale each during the preceding and current year, and also the fact that the president of the bank had been consulted about the value by both seller and buyer. The witness made it clear that he was undertaking to estimate the real value or worth of the stock in solido rather than the market price of separate shares, recognizing that this is as the market establishes it, but contending the value of the stock is to be gauged by the value of the corporation's assets.

Over against Dr. Martin's testimony is that of Robert J. Theobold, who is experienced both in the brokerage and banking business, and was acting Secretary of the Kentucky Bankers Association. He regarded the sale of the stock as very persuasive in establishing the fair value, but did not ignore other factors of earning power, trends in earnings, the decrease in the rate of yield on the bank's investments, the narrow market for

the stock, etc. While recognizing the constancy of the dividends and the yield to the stockholders on their investment, the witness noted a downward trend of earnings to be expected on this type of investment. From his experience he was of the opinion that no buyer of the stock would capitalize as part of the bank's earnings what it had recovered from loans previously charged off because they are "non-recurring," or the profit from the sale of securities or other assets because he regards a bank as not a dealer in securities except for the income from investment in them. Mr. Adams, the President of the bank, expressed the same view. Eliminating such profits from earnings of this bank, he found that the income properly to be considered to have been $8.60, $14.59, $9.81 and $13.85 a share for the years 1940 and 1943, inclusive. Upon these hypotheses, he based his opinion that the value of the stock was from $115 to $120 a share.

Of course, the balance sheet cannot be ignored in considering the matter of value nor the earnings of a business enterprise in the absence of substantial evidence of actual market price. Concerning this, Cooley on Taxation, Section 986, says:

"Book value, i. e., value based on tangible assets and liabilities, is an improper measure of value because it disregards the elements of good will, dividend earning power, ability in management, public confidence, and other intangible features that ordinarily tend to give the stock a selling value in excess of pure book value.

In valuing shares of stock the basis is not the intrinsic value of the assets and property of the bank after paying all its liabilities, or what would be the distribution were the bank to close and liquidate its business by converting its assets into cash and dividing it among its shareholders. Nor is it the value of the entire business as a going concern. And the capitalization of income is not a customary or recognized method for establishing tax values in this state except of franchises of certain public service corporations. Appraisement of value based upon these and other hypotheses and facts afford opportunity for subtle debate. There are many other elements and factors of value. By the side of these facts and theories is the knowledge that there are certain things which affect the market or sale price of securities,

.some of which may be delusive or illusory. Cf. Carr's Fork Coal Co. v. Perry County Board of Supervisors, 263 Ky. 642, 93 S. W. 2d 359. See 41 Am Jur:, Taxation, Secs. 697, 698, 700. As observed by Mr. Justice Holmes in Klein v. Board of Tax Supervisors, 282 U. S. 19, 51 S. Ct. 15, 75 L. Ed. 140, 73 A. L. R. 679, in affirming our opinion in 230 Ky. 182, 18 S. W. 2d 1009: "While no doubt the property and expectations of the corporation are the backbone of the value of the shares, yet the latter may get additional value from another source;" and further: "The corporation is a person, and its ownership is a non-conductor that makes it impossible to attribute an interest in its property to its members." General trends in the investment market; the prosperity or depression of the country or the particular community; fluctuations in the investment market and sale of the particular securities; confidence or lack of confidence in the particular management, and the character or disposition of actual or potential buyers and sellers—some timid and cautious, others bold and speculative—all enter into setting the market price.

In the absence of a market for stock or any other property, the estimates of value must, of course, be upon theories deducible from the various elements that enter into its value. Thus we have recognized in several cases the existence of classes of property of a special nature and of real value which are not capable of being marketed and no market for it exists, and which of necessity require the resort to other and unusual methods of ascertaining the taxable value. Cf. Commonwealth v. Sutcliffe, 287 Ky. 809, 155 S. W. 2d 243. But the bald question always is, What will it sell for? In National Bank of Commerce v. New Bedford, 155 Mass. 313, at page 315, 29 N. E. 532, at page 533, the case having to do with the value of bank stock, it was said: "Value refers to exchange. The cash value of an article is the amount of cash for which it will exchange in fact. That amount depends on the opinion of the public or possible buyers, or of that part of it which will pay the most." And further: "As a rule, the fair cash value of shares having a market is best ascertained by finding the price at which they sell in the market." Later in a similar case between the same parties, 175 Mass. 257, 56 N. E. 288, 290, Chief Justice Holmes also wrote:

628

"But generally speaking, when a statute requires the 'fair cash value' of property on a certain day to be ascertained * * * it refers to the actual judgment of the public as expressed in the price which some one will pay, not to what the court at a later time may think would have been a wiser opinion. It means the highest price that a normal purchaser, not under peculiar compulsion, will pay at that time to get that thing. Bradley v. Hooker [175 Mass. 142], 55 N. E. 848. If the word 'fair' is thought to add a little latitude to the definition, and to allow a correction of whatever was the fleeting accident of a moment of panic by the consideration of values on either side of the precise time fixed by the statute, that correction has been made."

In Ray v. Armstrong, 140 Ky. 800, 131 S. W. 1039, 1043, Judge O'Rear, speaking for this court, pointed out that all the machinery for assessing property for taxation looks to "its fair cash value, estimated at the price it would bring at a fair voluntary sale." Section 172, Constitution. He further wrote:

"Men may well differ as to the market value of a thing which has not been sold. It is a matter of opinion. But when it has been sold, at a voluntary sale, it is no longer a matter of opinion, but is a settled fact. The 'fair cash value, estimated at the price it would bring at a voluntary sale' of a particular piece of property which has just been sold at such a sale, is the price it brought. Such is the common sense view of it; and such is the fact. * * * If all the real property in a county should change ownership in a year, it would show with reasonable accuracy the fair cash value of all the real estate in that county. But it is not likely that that will ever occur. Still, that which in fact was sold at fair voluntary sale shows what the state of market is. Market values are always fixed by what is sold—not by what is not sold. Therefore that which is sold fixes beyond doubt its own fair cash value, and fixes with equal certainty, in legal intendment, the fair cash value of all such property 'estimated at the price it would bring at a fair voluntary sale.'"

See Annotations, under the title, "Basis of valuation of corporate stock for purposes of taxation of such stock." 107 A. L. R. 1263.

In the case at bar, it is not unnatural that the actual sales should have been few. There were only 1,000 shares of stock altogether. It was a stable investment during a period of war and uncertainty. It is true that we are concerned with the assessment of the entire 1,000 shares rather than of each separate share, so it is argued that the book value and other hypotheses based upon the whole property of the bank, assume a greater importance and the facts are entitled to greater weight than is the sale price of but a few shares of the stock. This argument loses sight of the independence and severability of the stock from the assets of the bank itself. We think that argument is also pretty well answered in the above abstract from Ray v. Armstrong. The argument was made in Bingham's Adm'r v. Commonwealth, 196 Ky. 318, 244 S. W. 781, that large blocks of stock and securities, having a recognized market value upon the New York Stock Exchange, should not be appraised by the same rule as are small blocks thereof. The Bingham estate owned so much stock in the Standard Oil Company that it was said if the stock should be offered for sale as a unit it would depress the market so that the current market quotations, based upon transactions involving only from 10 to 100 shares, ought not to be accepted as a criterion of value for inheritance tax purposes. We pointed out that to adopt that view would lead to the manifest injustice of appraising the same property for taxation at different values per unit on the same day against different owners in disregard of the constitutional guaranties of equality and uniformity. It was ruled in that case that every assessment of property "contemplates an assessment by units as customarily traded in at the fair cash value of such units on a given day and not as a mass or in blocks within such time as would be reasonably required to sell such blocks or the whole."

As the value of that entire large block of stock was held in that case to be properly fixed according to the sale of small units, so must it be in the valuation of the entire capital stock of this bank. Indeed, there is greater reason for doing so when it is remembered that the ultimate taxpayer is the individual shareholder who owns these small units.

Our conclusion of the whole matter is that the actual sales coupled with the considerations of the other elements entering into the value of the shares for purpose of taxation overcome the elements upon which the City bases its claims for a greater assessment. We think the trial court was justified in adjudging the fair market value of this stock to be $120 a share.

Judgment affirmed.

Whole Court sitting, except Judge Latimer, who was absent.

Judge Cammack dissenting.