In Re: Tax Assessments Against the National Bank of West Virginia at Wheeling and the Morris Plan Savings and Loan Company

(No. 10426)

Submitted September 23, 1952. Decided December 16, 1952.

*W. F. Keefer,* Assistant Prosecuting Attorney, *John R. Murphy,* for plaintiff in error.

*McCamic & Clarke, Charles McCamic* and *Jay T. Mc-Camic,* for defendants in error.

GIVEN, JUDGE:

This proceeding involves the correctness of *ad valorem* tax assessments for the year 1946 against the shareholders of The National Bank of West Virginia at Wheeling, and The Morris Plan Savings and Loan Company, an industrial loan company, of Wheeling. The Assessor of Ohio County, wherein Wheeling is situated, made assessments against the taxpayers in accordance with the method formulated by the State Tax Commissioner in 1941, and who sought its application by each of the assessors of the State in making assessments against all national banks, building and loan associations, federal savings and loan associations, industrial loan companies, small loan companies and credit unions. Appeals were taken from the assessments made by The Assessor of Ohio County to the

county court of that county and, after a full hearing, the court revised downward the assessment as to each taxpayer. The taxpayers named, and others not involved here, appealed from the county court's order fixing the assessment values, to the Circuit Court of Ohio County. After a full hearing, upon the record made before the county court, the circuit court reversed the order of the county court and, by separate orders, fixed the amounts of the assessments of the respective taxpayers at values below the amounts fixed by the county court. Upon petition of the State Tax Commissioner, this Court granted a writ of error to the judgments of the Circuit Court of Ohio County.

The method now contended for by the State Tax Commissioner for determining the proper value of such assessments is referred to as the "book value" method, and consists of the finding of the aggregate par value of the shares of capital stock outstanding, the amount of surplus, the amount of undivided profits, the amount of interest earned but not collected, and the amount of any reserves, deducting from such aggregate the amount of interest accrued on time and savings deposits, the amount of unearned discount included in undivided profits, and the amount of the assessed value of real estate. This method was approved by the State Tax Commissioner as the only method which would result in uniform taxation throughout the State, and apparently was adopted and applied by each of the assessors of the State in determining the proper valuation for tax assessment purposes, as to the property of each taxpayer included in the classes mentioned above. Also, this method was approved by the Assessors' Association for the State, and was followed by the Assessor of Ohio County in arriving at the proper value for the 1945 and 1946 assessments of the two taxpayers here involved. The Assessor of Ohio County testified to the effect that he believed the "book value" method the proper method as applied to the 1945 and 1946 assessments; that he considered no factor other than such method in arriving at the values for such assessments;

and that he was not coerced or unduly influenced by the State Tax Commissioner in adopting that method.

At the time of the 1946 assessment, The National Bank had five thousand shares of stock outstanding, of the par value of $100.00 per share, and The Morris Plan had outstanding one thousand shares of stock, of the par value of $100.00 per share. There is a stock exchange in the City of Wheeling; there are stock exchanges in certain counties in the State, but the greater number of counties in the State have no stock exchange and are not situated within any reasonable proximity to any such exchange. The stock of The National Bank is listed with the Wheeling Exchange, but the stock of The Morris Plan is not listed. In the year 1945 there were twelve shares of stock of The National Bank sold through the Wheeling Stock Exchange, each share at $165.00. Nineteen other shares were sold that year, but not through the exchange. The average price of the thirty-one shares was $154.00. From 1941 through 1945, 611 shares of the National Bank were sold, and the average price for the respective years varied from $115.00 in 1941 to $154.00 in 1945. No shares of The Morris Plan were sold through any exchange in 1945. From 1941 through 1944, 447 shares of The Morris Plan were sold, not through any stock exchange, and the average price therefor was $127.00. The dividends declared by The National Bank for the years 1941, through 1945, were, per share, $6.00, $7.00, $8.00, $8.00 and $10.00, respectively. Dividends declared for the same years by The Morris Plan were, per share, $8.00, $6.00, $6.00, $5.00 and $4.00, respectively.

In using the "book value" method, excluding all other factors, the assessor, for the year 1946, found the actual value of the stock of The National Bank to be $1,231,000.00, or $246.20 per share value. The county court, considering all relative methods and factors, arrived at a value of $1,125,000.00, or $225.00 per share value. The circuit court, upon the record made before the county court, considered "each and all the several elements of value disclosed by the record" and, after properly deducting the assessed

value of real estate, found the assessment value of all shares to be $871,450.00, or $174.29 per share value. The taxpayer contends for a value of $618,800.00, or $123.76 per share value, and applied only the so called "sales price" method in arriving at that amount. As to The Morris Plan for the year 1946, using the same method applied to The National Bank assessment, the assessor found the actual value of the stock to be $244,500.00, or $244.50 per share value. The county court found the assessment value to be $210,000.00, or $210.00 per share, and the circuit court, after deducting the assessed value of real estate, found the assessment value to be $172,110.00, or $172.00 per share value. The taxpayer contends for a value of $100,000.00, or $100.00 per share value, and arrives at that value by use of the so called "sales price" method.

For the year 1946 the tax return furnished the assessor by The National Bank, in accordance with the requirements of Code, 11-3-2, 3, shows a surplus of $500,000.00 undivided profits, amounting to $292,035.53, and interest and other income earned but not collected, in the amount of $4,926.85. The return of The Morris Plan for 1946 shows a surplus of $100,000.00, undivided profits in the amount of $46,868.34, and unearned discounts in the amount of $46,530.68.

For the purpose of establishing discrimination, the taxpayers here involved offered certain evidence to the effect that in arriving at assessment values of insurance companies, reserve funds are not included in the assessment value, except to the extent that such reserves exceed the amount of reserves which may be due policyholders, and because of the allowance of certain deductions to "ordinary companies other than banking institutions", such as percentages of book accounts, or intangibles questionable as to collectibility, such deductions not being allowed the class of taxpayers here involved. The evidence also shows that some of the taxpayers to whom such deductions are allowed lend money secured by mortgages or trust deed liens on real estate. It is not shown, however, to what extent such loans are made, or that such loans

are actually made in competition with the businesses of the taxpayers here involved. Certain differences in the nature of the types of businesses conducted are pointed out. Taxpayers to whom such discounts are allowed do not receive banking deposits; do not rent safety deposit boxes; do not accept such property as jewelry, plate, stocks and bonds, for safekeeping; do not accept for payment at future dates drafts drawn on customers; do not issue letters of credit authorizing the owners thereof to draw drafts; do not act as trustee, assignee, general or special receiver, guardian, executor or administrator; do not act as registrar or transfer agent for corporations in registering and transferring shares of stock, bonds or other obligations; and do not purchase, sell, take charge of or receive rents and profits from real estate. Other differences in the nature of the classes of businesses will appear later in this opinion. The evidence does not show to what extent, if any, the taxpayers herein lend money on mortgage or trust deed liens. It is also shown that part of the assets of The National Bank consists of United States nontaxable securities, and it is contended that the amount of the value of such securities should be deducted from the actual value of the assets before determining the assessment value of the assets of the taxpayer.

Of special significance in this proceeding, we believe, is the language of the county court used in its order fixing the assessment values of the taxpayers here involved for the year 1946, as the order relates to the method used in arriving at the assessment values, which we quote: "* * * did thereupon hear all the evidence on behalf and against the matters set forth in said petitions, consisting of evidence showing the earnings of each of said petitioners, the dividends paid to stockholders by said petitioners, the net worth of each petitioner as of January 1, 1946, the sales price received by petitioners or petitioners stockholders from each share of stock sold prior to the said first day of January, 1946, as well as the proportion of stock sold to the total outstanding stock of each petitioner, and also considered as to what extent

there was a normal and open market at the time such sales were made, and also the relationship of dividends to earnings of each of said petitioners, and the Board did thereupon consider all of said evidence offered by the parties hereto, and after due and full consideration of all of such evidence, finds and declares that after deducting the assessed valuation of the real estate owned and held in the name of each of said petitioners that the following values of said shares of stock to be the true and actual value of the same for the purposes of property taxation for the year 1946. * * *."

The order of the county court for 1945 as to the assessments against the two taxpayers involved is to the same practical effect. The 1945 assessments are not involved in this proceeding, and facts relating to that year are stated only for the purpose of answering a contention of the State Tax Commissioner, to be discussed herein.

A number of errors were assigned. We believe, however, that a determination of the following propositions will afford answers to all material questions: (1) Whether the assessments for the year 1946, fixed by the circuit court, were proper assessments; (2) whether the value of nontaxable securities of the National Bank or The Morris Plan should be deducted from the value of the assets before determination of the assessment value of the shares of stock; (3) whether the facts proved establish discrimination as against either of the taxpayers involved; (4) whether the shares of stock of The National Bank were assessed "at a greater rate than that imposed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks"; and (5) whether either of the taxpayers involved has been denied due process of law.

Our State Constitution, Article X, Section 1, provides: "Subject to the exceptions in this section contained, taxes shall be equal and uniform throughout the State, and all property, both real and personal shall be taxed in equal

proportion to its value to be ascertained as directed by law * * *." The exceptions made in the section have no application to the questions involved in the instant proceeding. Thus, the ultimate goal is "equal and uniform taxation". Uniformity, however, must be used in a somewhat relative sense, for no method has been devised, and probably can not be, whereby exact uniformity of taxation results to each taxpayer. In the opinion in the case of *In Re: Tax Assessments Against Charleston Federal Savings & Loan Association, et al.,* 126 W. Va. 506, 515, 30 S. E. 2d 513, Judge Fox uses this language: "While our State Constitution requires uniformity and equality in taxation, no one has ever believed that either could be attained as a practical matter. The constitutional provision is a statement of an ideal, and is implemented by numerous statutes, all seeking to put into practice such ideal so far as is humanly possible. But do all we can, and attempt as rigidly as we' may to enforce such statutes, we will fall far short of attaining equality, uniformity and justice in levying taxes. * * *". Ample opportunity, however, is afforded a taxpayer to show that he has been taxed unjustly.

Moreover, the uniformity required relates to property of a particular class. It is not required that property, businesses or income of different classes be taxed equally and uniformly. *Bankers Pocahontas Coal Co. v. County Court,* 135 W. Va. 174, 62 S. E. 2d 801; *In Re: Tax Assessments Against Charleston Federal Savings & Loan Association, et al.,* 126 W. Va. 506, 30 S. E. 2d 513, affirmed 324 U. S. 182, 65 S. Ct. 624, 89 L. ed. 857; *Arslain* v. *Alderson,* 126 W. Va. 880, 30 S. E. 2d 533; *In Re: Tax Assessments Against Hancock County Federal Savings and Loan Association,* 125 W. Va. 426, 25 S. E. 2d 543; *Bridge Co.* v. *County Court,* 41 W. Va. 658, 24 S. E. 1002.

Section 1 of Article IX of the State Constitution provides for the election of at least one, and not more than two, assessors for each county. The functions or duties of an assessor, however, are not prescribed by the Constitution. These are left solely to the will of the Legislature,

save as to the constitutional mandate that taxes be equal and uniform. The assessor's duties, however, are ministerial, not judicial. *State* v. *Rocke,* 91 W. Va. 423, 113 S. E. 647; *State* v. *Herrald,* 36 W. Va. 721, 15 S. E. 974. Code, 11-5-1, as amended, requires assessors of the several counties to annually assess all property within their respective counties, "as of the first day of January at its true and actual value; that is to say, at the price for which such property would sell if voluntarily offered for sale by the owner thereof, upon such terms as such property, the value of which is sought to be ascertained, is usually sold, and not the price which might be realized if such property were sold at a forced sale * * *." Code, 11-5-5, as amended, contains this provision: "* * * Investment, in notes, bonds, bills, stocks and other intangible property, shall be rated by the assessor at their market price, or if there be no known market price, then at their proper value, according to the rule prescribed in this chapter." No question is raised as to the power of the Legislature to provide or require a certain method for arriving at tax assessment values. The only limitation on that power, we believe, is the constitutional mandate that the tax be equal and uniform. See *In Re: Tax Assessments Against Charleston Federal Savings & Loan Association, et al.,* 126 W. Va. 506, 30 S. E. 2d 513, affirmed 324 U. S. 182, 65 S. Ct. 624, 89 L. ed. 857; *Power Co.* v. *Board of Review,* 112 W. Va. 442, 164 S. E. 862; *State* v. *Rocke,* 91 W. Va. 423, 113 S. E. 647; *Bridge Co.* v. *County Court,* 41 W. Va. 658, 24 S. E. 1002. Dealing specifically with assessments of shares of stock in banking institutions, national banking associations and industrial loan companies, Code, 11-3-14, as amended, reads in part: "Shares of stock in a banking institution, national banking association or industrial loan company shall be assessed at their true and actual value, according to the rules prescribed in this chapter, to the several holders of such stock in the county, district and town where such bank, company or association is located, and not elsewhere, whether such holders reside there or not. The real and actual value of such shares shall be ascertained according to the best information

which the assessor may be able to obtain, whether from any return made by such bank, company or association to any officer of the state or the United States, from actual sales of the stock, from answers to questions by the assessor, as hereinafter provided, or from other trustworthy sources. The cashier, secretary or principal accounting officer of every such bank, company or association shall cause to be kept a correct list of the names and residences of all the shareholders therein, and the number of shares held by each, * * * and such cashier, secretary or officer shall answer under oath such questions as the assessor may ask him concerning the matters shown by such list, and concerning the value of such shares, * * *." Chapter 118, Acts of the Legislature, 1939, now Code, 11-3-14a, provides a different basis for assessing building and loan associations and federal savings and loan associations, in that the capital, as evidenced by investment shares and investment accounts, shall be assessed, and providing further that the assessor "shall take into consideration all earned reserves and undivided profits of any such association." But by this section, as well as by Code, 11-3-14, as amended, the assessor is directed to find the assessment values by use of the best information obtainable. See *In Re: Tax Assessments Against Hancock County Federal Savings and Loan Association*, 125 W. Va. 426, 25 S. E. 2d 543. The method contended for by the State Tax Commissioner makes no distinction as to the method of assessing such associations.

National banks are subject to taxation by the States only to the extent expressly permitted by Congress. *Bank* v. *State*, 58 W. Va. 559, 52 S. E. 494, 3 L. R. A. (N. S.) 584, 6 Ann. Cas. 115; *Farmers & Merchants National Bank* v. *Dearing*, 91 U. S. 29, 23 L. ed. 196; *Hammond* v. *Commonwealth of Massachusetts*, 70 U. S. 573, 3 Wall. 573, 18 L. ed. 228; *First National Bank* v. *Anderson*, 269 U. S. 341, 46 S. Ct. 135, 70 L. ed. 295; *Owensboro National Bank* v. *City of Owensboro*, 173 U. S. 664, 19 S. Ct. 537, 43 L. ed. 850; *Charleston National Bank* v. *Melton*, 171 Fed. 743.

The permission granted by Congress, 12 U. S. C. A., Section 548, provides:

"The legislature of each State may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several States may (1) tax said shares, or (2) include dividends derived therefrom in the taxable income of an owner or holder thereof, or (3) tax such associations on their net income, or (4) according to or measured by their net income, provided the following conditions are complied with:

"1. (a) The imposition by any State of any one of the above four forms of taxation shall be in lieu of the others, except as hereinafter provided in subdivision (c) of this clause.

" (b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks: *Provided,* That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section."

The State has elected, by enacting the provisions of Code, 11-3-14, quoted above, to tax the respective holders of the shares of stock of such banks. Having adopted this method, the State is limited by the federal statute quoted to the one method, and it can not tax such shares at a rate greater than the rate of taxation imposed upon "other moneyed capital" in competition with the business of national banks. It is significant that the shareholders of a national bank are taxed, instead of the bank itself. This is clearly pointed out in numerous decisions. In

*People* v. *Coleman*, 126 N. Y. 433, 27 N. E. 818, the Court stated:

"The capital stock of a company is one thing; that of the shareholders is another and a different thing. That of the company is simply its capital, existing in money or property or both; while that of the shareholders is representative, not merely of that existing and tangible capital but also of surplus, of dividend earning power, of franchise, and the good will of an established and prosperous business. The capital stock of the company is owned and held by the company in its corporate character; the capital stock of the shareholders they own and hold in different proportions as individuals. The one belongs to the corporation; the other to the corporators. The franchise of the company, which may be deemed its business opportunity and capacity, is the property of the corporation, but constitutes no part or element of its capital stock; while the same franchise does enter into and form part, and a very essential part, of the shareholder's capital stock. While the nominal or par value of the capital stock and of the share stock are the same, the actual value is often widely different. The capital stock of the company may be wholly in cash or in property or both, which may be counted and valued. It may have in addition a surplus, consisting of some accumulated and reserved fund, or of undivided profits, or both; but that surplus is no part of the company's capital stock, and therefore is not itself capital stock. The capital cannot be divided and distributed; the surplus may be. But that surplus does enter into and form part of the share stock, for that represents and absorbs into its own value surplus as well as capital, and the franchise in addition; so that the property of every company may consist of three separate and distinct things, which are its capital stock, its surplus, and its franchise; but these three things, several in the ownership of the company are united in the ownership of the shareholders. The share stock covers, embraces, represents all three in their totality; for it is a business photograph of all the corporate posses-

sions and possibilities. A company also may have no surplus, but, on the contrary, a deficiency which works an impairment of its capital stock. Its actual value is then less than its nominal or par value, while yet the share of stock, strengthened by hope of the future and the support of earnings, may be worth its par, or even more. And thus the two things, the company's capital stock and the shareholder's capital stock, are essentially and in every material respect different. They differ in their character, in their elements, in their ownership, and in their values. How important and vital the difference is became evident in the effort by the state authorities to tax the property of the national banks. The effort failed, and yet the share stock in the ownership of individuals was held to be taxable as against them. The corporation and its property were shielded, but the shareholders and their property were taxed." See *Bank* v. *State*, 58 W. Va. 559, 52 S. E. 494, 3 L. R. A. (N. S.) 584, 6 Ann. Cas. 115; *Des Moines National Bank* v. *Fairweather*, 263 U. S. 103, 44 S. Ct. 23, 68 L. ed. 191.

With these principles and statutes in mind, we reach the contention of the State Tax Commissioner to the effect that he is vested with authority to adopt and enforce the "book value" method, defined above, for the purpose of securing equal and uniform taxation throughout the State. As previously noticed, the duties of an assessor are entirely subject to the will of the Legislature, and may be limited or transferred to another, so that if we find statutory authority granting such powers to the State Tax Commissioner, there can be no contention that any conflict exists as between the duties or powers of the assessor and the State Tax Commissioner. In other words, the will of the Legislature necessarily controls. Code, 11-1-2, as amended, defines the general duties and powers of the tax commissioner. It is his duty to see that laws concerning the assessment and collection of taxes, whether state, county, district or city, are enforced; prepare forms and books for use and guidance of assessors; inspect work of assessors; give information and "require such action

as will tend to produce full and just assessments throughout the State, and diligent collection of" all taxes; enforce penalties provided by law, "including, in any proper case, the removal of such officer, and to that end he is authorized to appear before any court," having jurisdiction. In certain instances, at least, mandamus lies at the instance of the State Tax Commissioner to require assessors to perform their duties. See *State* v. *Rocke*, 91 W. Va. 423, 113 S. E. 647; *State* v. *Herrald*, 36 W. Va. 721, 15 S. E. 974.

Other Code provisions increase the width and effectiveness of such powers. We think, however, that it will not be contended that the State Tax Commissioner may so construe the provisions as to authorize him to proceed in the performance of his duties in direct violation of the will of the Legislature, as expressed in some enactment. We believe that will has been clearly expressed in Code, 11-3-14, as amended, quoted in part above. The specific direction of the Legislature to the assessor is that "The real and actual value of such shares shall be ascertained according to the best information which the assessor may be able to obtain, whether" by using a certain specified method or methods, "or from some other trustworthy sources". A definite objective is fixed, "real and actual value", and this is to be reached by use of "the best information" obtainable. No one method or factor is required to be given weight above other methods or factors, but all pertinent factors must be considered; otherwise, the "best information" requirement could not be satisfied. The "best information" requirement demands something more than the adoption of one method or procedure for the ascertainment of real and actual value. The words "may be able to obtain", as used in the statute, require effort on the part of the assessor to obtain the best information concerning the real and actual value of the shares of stock to be assessed, not merely the adoption of some method for arbitrarily arriving at such value, notwithstanding the method adopted may, in a majority of cases, prove more accurate than any other single method.

Applying these principles to the facts relating to the

1946 assessments, we find that the assessments made by the Assessor of Ohio County were not made in conformity with the requirements of the statute. He testified to the effect that he considered no factor or evidence relating to the actual value of the shares of stock other than the "book value" thereof. Therefore, the county court, on appeal, was justified in not adopting or approving the findings of the assessor. The county court, however, on the hearing before it on appeal, considered all pertinent evidence produced and all relevant factors as detailed in its order, quoted in part above. Therefore, the assessments fixed by the county court should stand, unless there appears in the record some fact or facts which clearly establish the assessments to be erroneous. The burden of showing an assessment to be erroneous is, of course, upon the taxpayer, and proof of such fact must be clear. *Bankers Pocahontas Coal Co.* v. *County Court,* 135 W. Va. 174, 62 S. E. 2d 801; *In Re: Tax Assessments Against Charleston Federal Savings & Loan Association,* 126 W. Va. 506, 30 S. E. 2d 513, affirmed 324 U. S. 182, 65 S. Ct. 624, 89 L. ed. 857; *Power Co.* v. *Board of Review,* 112 W. Va. 442, 164 S. E. 862; *Amoskeag Savings Bank* v. *Purdy,* 231 U. S. 373, 34 S. Ct. 114, 58 L. ed. 274.

The circuit court apparently arrived at the assessment value of The National Bank stock by applying three methods only, "namely, the total capital assets of said Bank (without allowance for costs of liquidation and conversion into money, and without consideration of the improbability of liquidation wherein the share holder could receive his proportionate share of the assets of the Bank in money); the value of the total and undiminished capital assets divided by the number of outstanding shares resulting in $293.40 per share; the average sale price per share for the last available year per share of $154.00, and the dividends paid for the last available year which were $10.00 per share; the largest dividend paid in the preceding five years, which capitalized at six per cent (6%) results in a yield or return basis of $166.66 per share." The total per share value of each of the three methods was

then divided by three, resulting in the supposed true or actual value of $204.69 per share. The true and actual value of the 5000 shares of stock was fixed at $1,023,450.00. From that value there was deducted the assessed value of the real estate on which taxes had been paid, resulting in an assessment value of $871,450.00, or $174.29 per share value. The result obtained from the factors considered by the circuit court demonstrates the inaccuracy of the per share value found, $174.29. One method resulted in a per share value of $293.40; the sales price method, $154.00; the dividend method, $166.66. If either method is approximately correct, the other methods clearly are erroneous. Yet the sum total of the errors is reflected in the average of the three methods. The circuit court order recites that the court took "into consideration each and all of the several elements of value disclosed by the record", but it seems apparent that no material weight was given to such "elements", as was done by the county court, and we perceive no reason why such elements or factors should not have been given proper weight. We see nothing in the record which would warrant the circuit court in reaching a result different from that of the county court as to the proper assessment value. In other words, the taxpayers failed to carry the burden of clearly establishing the assessments fixed by the county court to be erroneous, as required to do by the authorities cited above. The conclusion reached as to The National Bank assessment necessarily controls the question as to The Morris Plan assessment.

It is strongly urged in argument that the holding in the case of *Des Moines National Bank* v. *Fairweather*, 263 U. S. 103, 44 S. Ct. 23, 68 L. ed. 191, is authority for the adoption of the "book value" method. In answer, we need only point out that the holding was based upon a state statute wholly unlike the West Virginia statute, as disclosed by the opinion.

The contention of the taxpayer that the actual value of the shares of stock should be determined solely by the use of the "sales price" method must be rejected for the same reason that the "book value" method is rejected. It

does not conform with the statutory requirement. We do not mean to say, of course, that the "book value" method or the "sales price" method may never reflect the actual value, or the assessment value. In certain circumstances, the assessor may be justified in determining that either method, or some other method, reflects such values. In other words, such methods may amount to the best evidence obtainable. The point is that all pertinent methods or evidence obtainable must be considered. See *Board of Supervisors* v. *Bank,* 300 Ky. 620, 189 S. W. 2d 942; *In Re: Appeal of Smith,* 1 U. S. Board of Tax Appeals 868.

We now reach the question whether the nontaxable securities held by The National Bank and The Morris Plan, as part of their assets, should be deducted from the capital assets for the purpose of arriving at the assessment value of the shares of stock. It is contended by the taxpayer that the deduction should be allowed, for the reason that otherwise such securities would be taxed, though indirectly. We think the deductions should not be made. We must keep in mind that property of national banks is not taxed. Only the shares of capital stock are taxable, and taxable only against the individual shareholders, not against the bank. The answer to the question is made clear by the language used in *People* v. *Coleman,* quoted above. In *Hammond* v. *Commonwealth,* 70 U. S. 573, 3 Wall. 573, 18 L. ed. 228, as appears from the Headnote, it is held: "A state possesses the power to authorize the taxation of the shares of national banks in the hands of stockholders, whose capital is wholly vested in stock and bonds of the United States, under the act of Congress of June 3, 1865." See *First National Bank* v. *Tax Commission,* 289 U. S. 60, 53 S. Ct. 511, 77 L. ed. 1030, 87 A. L. R. 840; *Des Moines National Bank* v. *Fairweather,* 263 U. S. 103, 44 S. Ct. 23, 68 L. ed. 191; *Charleston National Bank* v. *Melton,* 171 Fed. 743.

Neither are we of the opinion that any discrimination has been shown as to either of the taxpayers involved. The contention as to discrimination rests upon proof that extends no further than to show that certain reserves of

life insurance companies are not taxed, and that certain deductions are allowed by the assessor in arriving at the actual value of certain classes of intangible property of other classes of businesses, such as building and loan and small loan companies. We think a sufficient answer to the contention is that the uniformity of taxation requirement does not extend to different classes of businesses. The Legislature may permit different classes of property and different classes of businesses to be taxed at different rates. The Supreme Court of the United States, as shown in Headnotes 7 and 8, *Charleston Federal Savings & Loan Association* v. *Alderson*, 324 U. S. 182, 65 S. Ct. 624, 89 L. ed. 857, held:

"7. That notes and accounts receivable of building and loan associations and Federal loan associations are assessed for state taxation at their face value, while the notes and accounts receivable of small loan companies are assessed at less than their face value, and that other personal property in the same constitutional classification of taxable property, made for the purpose of fixing limits on taxation, is assessed at a fixed fraction of its purchase value, does not establish an unconstitutional discrimination in violation of the equal protection clause of the Fourteenth Amendment where there is nothing to show intentional discrimination or that the method followed has resulted in an assessment of property at less than its true value."

"8. The equal protection clause of the Fourteenth Amendment applies only to taxation which in fact bears unequally on persons and property of the same class, and mere differences in methods of assessment do not deny equal protection unless they are shown to produce such inequality." See *First National Bank* v. *Tax Commission*, 289 U. S. 60, 53 S. Ct. 511, 77 L. ed. 1030, 87 A. L. R. 840; *San Francisco National Bank* v. *Dodge*, 197 U. S. 70, 25 S. Ct. 384, 49 L. ed. 669; *Bank of Redemption* v. *Boston*, 125 U. S. 60, 8 S. Ct. 772, 31 L. ed. 689.

As to the contentions concerning the deductions allowed by the assessor, we think the following language

used by the Court in its opinion in the case of *In Re: Tax Assessments Against Charleston Federal Savings & Loan Association, et al.,* 126 W. Va. 506, 30 S. E. 2d 513, affirmed 324 U. S. 182, 65 S. Ct. 624, 89 L. ed. 857, furnishes a sufficient answer: "* * * It may be claimed that the method employed in the assessment of loan companies is discriminatory, but to sustain that claim appellants would have to concede that the securities held by such loan companies are of the same type, and as well secured as their own. * * *.

"That the assets of the appellants are made up of high-grade securities will not be denied. There is and can be no reasonable doubt as to their being worth one hundred per cent of their face value. No one can question values based on securities of the Government of the United States. When we come to their chief business, that of lending money on real estate, we must consider that every loan is made upon fair appraisement of real estate; the loans are confined to a percentage of the appraised value of such real estate, in order to guard against fluctuation in value; the property on which the loans are made is insured against destruction by fire and otherwise, and, generally, every possible step taken to secure the solvency of every dollar of such assets. In addition their business is subject to the rigid and constant supervision of the State or Federal Government, or both, and their solvency at all times is a mandatory requirement for doing business. Such a class of assets is, of course, clearly distinguishable from the ordinary run of notes and accounts. Of course, notes held by individuals, firms and corporations are, sometimes, equally well secured; but when we treat them as a class such statement does not hold good."

A further contention is that since insurance companies lend money secured by liens on real estate, and that certain finance companies lend money on collateral security and discount or deal in commercial paper, the West Virginia statute relating to assessment of shares of stock of

national banks, is void in that it is inconsistent with the provisions of 12 U. S. C. A. 548, requiring that the rate of assessment of taxes against shares of stock of national banks shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state coming into competition with the business of national banks. We think the evidence falls far short of that required to establish such competition of "other moneyed capital". In *First National Bank* v. *Tax Commission,* 289 U. S. 60, 53 S. Ct. 511, 77 L. ed. 1030, 87 A. L. R. 840, as shown in Headnote 5, it is held: "No such competition exists between national banks and lenders of money on real estate mortgages, loan companies, so-called Morris Plan and Morgan Plan companies, and automobile finance companies, as will render a state statute taxing national bank shares discriminatory and so violative of Rev. Stat. §5219, where it appears that although the complainant banks hold real estate mortgages in a substantial amount as security for loans made, they are not engaged in lending money on mortgages, and the business of the loan and finance companies in the making of small loans and the financing of purchases of automobiles and household goods and is a class of business not done or desired by national banks." See *First National Bank* v. *Anderson,* 269 U. S. 341, 46 S. Ct. 135, 70 L. ed. 295; *Bank of California* v. *Richardson,* 248 U. S. 476, 39 S. Ct. 165, 63 L. ed. 372; *Amoskeag Savings Bank* v. *Purdy,* 231 U. S. 373, 34 S. Ct. 114, 58 L. ed. 274.

The Morris Plan Savings and Loan Company contends that it is not afforded the equal protection guaranteed by the due process clauses of the State and Federal Constitutions, in that it is required to pay a higher rate of taxation than insurance and other companies to which certain discounts are allowed, but are denied The Morris Plan Savings and Loan Company. We think the question is rendered moot, however, in view of the conclusions herein announced. Also moot are the questions raised as to the refunds ordered by the circuit court to be paid unto

the taxpayers involved, since no question of any refund will arise upon the ascertainment of the proper assessment values in the manner herein indicated.

A further contention of the State relates to the action of this Court in refusing a writ of error to the judgment of the Circuit Court of Ohio County, wherein assessments for the year 1945 were made against the taxpayers involved in the instant proceeding, the contention being that this Court, in refusing the writ of error, at least indirectly, approved the use of the "book value" method adopted by the Assessor of Ohio County. As has often been pointed out by the Courts, the refusal of a Court to grant a writ of error in no manner indicates the view of the Court on any question involving the merits of the case. Moreover, the order of the circuit court did not, in effect, approve the "book value" method. It affirmed the order of the county court, which court, as before pointed out, followed the requirements of the statutes, as it did in its consideration of the 1946 assessment.

By stipulation of record in this proceeding, the parties agreed that assessments against the taxpayers here involved, for the years 1947, 1948, 1949 and 1950, are to be made in accordance with the principles finally determined to be applicable in the making of the proper assessments for the year 1946. Separate orders were entered by the circuit court as to each taxpayer for each of those years, fixing the respective assessments in the manner in which the circuit court fixed the assessments for the year 1946. See *First National Bank* v. *Tax Commission*, 289 U. S. 60, 53 S. Ct. 511, 77 L. ed. 1030, 87 A. L. R. 840.

From the conclusions reached, it necessarily follows that the judgments of the Circuit Court of Ohio County, ascertaining the tax assessments of the taxpayers for the years 1946, 1947, 1948, 1949 and 1950, must be reversed, and this proceeding remanded to that court for the purpose of ascertaining the assessment values of The National Bank of West Virginia at Wheeling, and The Morris Plan

Savings and Loan Company, for each of those years, in accordance with the principles herein announced.

*Reversed and remanded.*