Edgar V. ALBERT et al., Appellants,

v.

BLACK MOTOR COMPANY, a Corporation, et al., Appellees.

Court of Appeals of Kentucky.

March 23, 1962.

Rehearing Denied June 22, 1962.

James Sampson, William A. Rice, Harlan, Logan E. Patterson, Pineville, for appellants.

James S. Greene, Jr., Harlan, Herschel M. Sutton, Corbin, for appellees.

CLAY, Commissioner.

This suit was instituted by a stockholder of Black Motor Company for and on behalf of such company and its other stockholders. Damages were sought against five of its directors for profits allegedly realized on the sale of stock owned by it in another corporation. The claim was dismissed as to four of the directors, and appellant Albert appeals from a judgment against him in the sum of $192,368.

The claim is founded on the breach of fiduciary duty, fraud and concealment. The basic facts are not in dispute.

Black Motor Company (hereafter referred to as "Black") was incorporated in 1921 to engage in the general automobile and motor business. Albert was a stockholder and director of this corporation. He subsequently became its president and at all times hereafter related effectively controlled it.

In 1937 Albert promoted the creation of a new corporation, Southeastern Gas and Oil Company (hereafter referred to as "Southeastern"). This company was chartered to engage in the wholesale distribution of gas, oil and automobile accessories, with an authorized capital stock of 250 shares ($100 par value). When Southeastern was incorporated sixty shares were issued to Black, and in 1953 a total of 176 shares had been issued to it. Nothing of value was paid or contributed by Black for any of this stock. However, for many years Southeastern was recognized by both companies as a legitimate subsidiary of Black.

Shortly after the incorporation of Southeastern, at the first meeting of stockholders in 1938 (at which time Black was the principal stockholder and was represented by Albert) by some manipulation the stock of Black was changed from voting to nonvoting stock. (The Chancellor found this to be illegal.)

In 1953 the capital structure of Southeastern was changed and its stock was in-

creased from 250 to 500 shares. No additional stock was subscribed by or on behalf of Black, but by the purchase of additional shares Albert became the principal stockholder in Southeastern. (The judgment awards damages based on the value of 352 shares, being the original 176 plus an additional 176 which Albert should have acquired for Black. This phase of the judgment is not attacked.)

In December 1954 the Texas Company cancelled the distributorship agreement it had with Southeastern and immediately entered into a similar agreement with Albert. He thereupon sought out, individually, the majority of Black's directors, and having advised them about the cancellation of the Southeastern franchise and representing the stock would be sold to the employees of Southeastern, induced them to execute a writing which approved the sale of the 176 shares owned by Black for $150 a share. (This backhanded method of committing the directors was not a valid act of the corporation.) In January 1955 these 176 shares were transferred to Albert and he paid Black $26,400. Subsequently in August 1955, at a special meeting of Black's directors, the majority ratified their previous action in authorizing the sale of this stock.

Prior to this last step appellant, having acquired the franchise formerly held by Southeastern and having acquired all of Black's stock in that corporation, in March 1955 formed a new company in his own name to take over the business of Southeastern. (This project was not completed, and it is not of significance except to complete the picture of Albert's overall plan.)

While all the foregoing transactions were taking place, appellant was president, director and the principal active officer of both Black and Southeastern. When he was negotiating the sale of Black's 176 shares of Southeastern stock, he did not disclose to Black's directors or stockholders that he had acquired the Texas franchise or that he was the buyer of the stock. There

is no doubt on this record that Albert manipulated both Black and Southeastern for his own benefit, in total disregard of his fiduciary obligations to these corporations and the rights of their other stockholders. See Reinhardt v. Owensboro Planing Mill Co., 185 Ky. 600, 215 S.W. 523.

Albert does not deny his fiduciary obligations to Black nor does he assail the basic findings of fact of the trial court with respect to the transactions above related. We will take up his specific contentions seriatim.

Appellant first contends that Black had no substantive or enforceable rights in its 176 shares of Southeastern stock because they were issued without consideration and in violation of section 193 of the Constitution of Kentucky. That section provides that any fictitious increase of stock "shall be void".

It may be conceded that this stock was at least voidable as to Southeastern, its stockholders and its creditors. The difficulty with Albert's position is that he endowed it with the incidents of valuable property. In the first place, it was according to his plan that Southeastern issued the stock to Black. Secondly, pursuant to his plan and with his knowledge and consent, Southeastern was treated on the books of Black as its subsidiary. Thirdly, as a director of Southeastern he participated in the payment to Black of dividends accruing on this stock. Finally, he recognized the stock constituted a valuable asset of Black when he took great pains to negotiate the purchase of it for $26,400.

█ Whether this stock was illegally issued, or could have been cancelled, or actually gave Black an ownership interest in Southeastern, is immaterial. No claim is asserted against Southeastern. It was Albert himself who engineered the issuance of this stock, who maintained it on the books as a valuable asset of Black, and who eventually paid a substantial price for it. In addition, it was clearly his duty, as the

highest ranking executive officer of both corporations, to see to it that this stock was validly issued and paid for by Black.

■ Reduced to its essence, Albert's claim is that the breach of his fiduciary duties to both corporations with respect to this stock somehow shields him from liability for breach of other fiduciary duties to Black by which he obtained for his own benefit the property of the latter. We do not see how his own wrongs could create in him any rights, nor can we discern what standing he has in court to invalidate a business transaction which he actively initiated and perpetuated for and on behalf of the corporation he represents.

The situation is similar to that in Franklin v. Mortgage Guaranty & Security Co., 9 Cir., 57 F.2d 834. There the president of a corporation was sued for secret profits he realized on the sale of stock. One of his defenses was that the sale by the corporation was illegal. The court rejected this defense and pointed out that the defendant was guilty of a double wrong in both permitting the corporate delinquency and attempting to make a secret profit therefrom. That is exactly what we have here.

Another comparable case is Pittsburg Mining Co. v. Spooner, Wis., 74 Wis. 307, 42 N.W. 259. In that case the defendants formed a corporation and thereafter in effect sold to it for $90,000 property they had acquired for the corporation at a price of $20,000. When sued for this secret profit, they defended on the ground that the corporation itself was illegally organized. The court said, 42 N.W. page 264:

"These defendants, who were the active agents in the formation of the corporation, who were instrumental in the issue of the alleged illegal stock, and who contracted with the corporation having full knowledge of all of its transactions, are in no position to contest the regularity of the formation of the corporation."

We cannot imagine a clearer case of estoppel to deny that the Southeastern Stock constituted one of Black's valuable assets. See 11 Fletcher Cyc.Corp. (Perm.Ed.) Section 5169 (page 464); Shannon's Co-Executors v. Shannon Spring Bed Mfg. Co., 313 Ky. 463, 230 S.W.2d 457.

■ The same principles apply to Albert's related contention that Black had no legal power under its charter to acquire stock in another corporation. Assuming this to have been an ultra vires act, clearly it cannot be attacked by the president, director and stockholder of the corporation who not only assented to the transaction but himself devised and consummated it. See Lincoln Court Realty Co. v. Kentucky Title Sav. Bank & Trust Co., 169 Ky. 840, 185 S.W. 156; 7 Fletcher Cyc.Corp. (Perm. Ed.) Section 3453 (page 600).

Another related contention is that the Black corporation on whose behalf this suit is brought never owned any Southeastern stock regardless of whether it was legally or illegally issued. This contention is based on the fact that the corporate life of the original Black Motor Company, to whom the stock was issued, expired in 1946. A new corporation with the same name, on whose behalf this suit is prosecuted, was organized in 1953 and took over the assets of the old corporation. Whether or not there had been a proper transfer of the shares to the new corporation on the books of Southeastern, both corporations and Albert treated the stock as if such transfer had been made. It appears this question was not raised in the lower court, but in any event, Albert's argument is not persuasive.

■ The next contention is that the principal asset of Southeastern was the Texas franchise, that Black was not in a position to acquire this franchise, and therefore Black was not entitled to any profits realized by Albert upon his personal acquisition of it. Albert cites respectable authority for the proposition that an officer

of a corporation has the right to engage in business ventures on his own account without breach of fiduciary duty if the corporation lacks the power or the ability to engage in such an independent enterprise. We have difficulty comprehending Albert's argument or the applicability of the legal principles upon which he relies.

This suit is not brought to charge him with profits realized by the acquisition of the Texas franchise originally held by Southeastern. The claim against him is that he purchased from Black its shares of stock in Southeastern at a price substantially less than their fair value.

It may be true the Texas franchise constituted a valuable asset of Southeastern and its loss may have affected the value of the stock. However, that is not Albert's contention. Apparently he does not make such claim because (1) the loss of the franchise resulted from his breach of fiduciary duty to both Black and Southeastern, and (2) the parties agreed the book value of the stock on November 30, 1954 (before the loss of the Texas franchise) would be fairly representative of its book value at the time it was purchased by Albert in January 1955 (after he had acquired the franchise). The answer to Albert's contention on this point is that whatever profits he made by virtue of the acquisition of the Texas franchise, which were not even shown on this record, were not sought by appellee.

■ The next major contention of Albert is that the sale of the Southeastern stock was effectively ratified by Black. This was purportedly done at a special meeting of the Board of Directors held August 29, 1955. A prime requisite of an effective ratification of such a transaction is that the corporation have full knowledge of all material facts relating thereto. 13 Am.Jur., Corporations, Section 978 (page 930); Kenyon Realty Co. v. National Deposit Bank, 140 Ky. 133, 130 S.W. 965, 31 L.R.A.,N.S., 169.

■ The trial court found that at this meeting Albert did not disclose that (1) he was the purchaser of the stock or (2) he was the holder of the Texas franchise. Clearly these were material facts and the record amply supports the Chancellor's finding that they were not known to the directors and were not disclosed. Not only was there direct evidence on this issue but there was ample circumstantial evidence that Albert made every effort to conceal the true nature of the transaction. He had attempted to obtain the approval of the directors in an unorthodox way, and at regular meetings of both the stockholders and the Board of Directors after the purchase of stock, no mention of it was made. The court's finding on this question is fully supported by the evidence.

Albert's next contention is that there was no proper evidence to support the trial court's finding that $675 was the fair market value of a share of stock in Southeastern at the time of the purchase by Albert. This finding was principally based upon the "book value" of the stock as determined by a certified public accountant. It is Albert's argument that book value is not a fair measure of market value.

■ It is generally recognized that the best evidence of market value is the price at which stock is bought at bona fide, voluntary sales. In this case, however, the Chancellor was confronted with a closely held corporation whose stock had not been bought or sold on the open market. There were a few isolated sales of the stock at $100 (the par value), but this appears to have been the price paid to Southeastern upon the issuance of stock and the sales were obviously consummated for the purposes of management of the corporation. There were no sales which would establish a fair market value.

Under those circumstances, as a matter of practical necessity, resort must be had to other evidence such as the value of the corporate assets, good will, earning capacity, and other items. See 11 Fletcher Cyc.

Corp. (Perm. Ed.) Section 5119 (page 226); State v. Carpenter, 51 Ohio St. 83, 37 N.E. 261; Moffit v. Hereford, 132 Mo. 513, 34 S.W. 252; Hetrick v. Smith, 67 Wash. 664, 122 P. 363.

This Court has recognized that book value is a proper and substantial criterion of market value when the latter cannot be established by sales of stock. Dumesnil v. Reeves, 382 Ky. 563, 142 S.W.2d 132; Board of Supervisors, etc. v. State National Bank of Frankfort, 300 Ky. 620, 189 S.W. 2d 942.

■ It is true that the book value may be either more or less than market value. In this case appellees' certified public accountant found the book value to be $752.56 per share. Taking other factors into consideration, the Chancellor determined the fair market value to be $675. There was ample substantial evidence to support this finding.

■ Finally, Albert contends the judgment is inequitable in awarding damages instead of requiring him to transfer to Black the 176 shares formerly owned by it. The court made a finding that due to the subsequent transfer of these shares by Albert, the lapse of time, and certain developments in the conduct of the business of Southeastern, it would be difficult and would involve endless litigation if an attempt were made to recreate the status quo at the time of the purchase of stock by Albert. We concur in this finding and certainly can find no error in the form of relief granted.

The judgment is affirmed.